# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

**FILED**

**February 1, 2000**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

BARRY STOKES and )
PAMELA STOKES, )
                      )
      Petitioners/Appellees, )     Appeal No.
                      )     M1998-00749-COA-R3-CV
VS. )
                      )     Dickson Chancery
TORINA ARNOLD, )     No. 4985-97
                      )
      Respondent/Appellant, )
                      )
RICHARD ARNOLD, JOHNNY )
LYNCH and TENNESSEE )
DEPARTMENT OF CHILDREN'S )
SERVICES, )
                      )
      Defendants. )

APPEALED FROM THE CHANCERY COURT OF DICKSON COUNTY
AT CHARLOTTE, TENNESSEE

THE HONORABLE ALLEN W. WALLACE, CHANCELLOR

ROBERT D. TUKE
1100 Nationsbank Plaza
414 Union Street
Nashville, Tennessee 37219
      Attorney for Petitioners/Appellees

CHRISTINE ZELLAR CHURCH
120 Franklin Street
Clarksville, Tennessee 37040
      Attorney for Respondent/Appellant

REVERSED AND REMANDED

BEN H. CANTRELL,
PRESIDING JUDGE, M.S.

CONCUR:
KOCH, J.
COTTRELL, J.

## O P I N I O N

The Chancery Court for Dickson County terminated a mother's parental rights to three young children and allowed the foster parents to proceed with the adoption of the children. Because we find that the record does not

contain clear and convincing evidence upon which to base the termination of the mother's parental rights, we reverse.

## I.

The State of Tennessee took protective custody of the three natural children of Torina Arnold on May 11, 1994, after receiving a referral alleging that she had threatened to commit suicide and to take her children with her. At the time, Ms. Arnold was living with her three children and her boyfriend, John Lynch. The record indicates that Ms. Arnold had been threatened with eviction and her relationship with Mr. Lynch had been deteriorating. She was subsequently admitted to the stress ward of Clarksville Memorial Hospital for several days and her children were placed with foster parents and appellees, Barry and Pamela Stokes. Ms. Arnold was then diagnosed with schizoaffective disorder by Dr. Terry Peacher. Ms. Arnold began attending therapy sessions and taking medication for depression. At the time of placement in foster care, the oldest child, Rebecca, was three years old, Christian was two years old, and Johnny was ten weeks old.

Ms. Arnold's children remained in foster care while she worked with DCS to fulfill the requirements of her plan of care. The record indicates that the ultimate goal of DCS throughout the children's placement in foster care was reunification. In the first few months after the children were placed in protective custody, Rebecca was diagnosed with a severe language and speech impairment, and Christian was diagnosed with a moderate speech and language impairment. At that time, Ms. Arnold was still involved in a relationship with Mr. Lynch. Although a 1995 DCS Progress Report indicates that Ms. Arnold was attending individual and couples counseling and fulfilling her visitation requirements, Mr. Lynch was not cooperating with the recommendations of DCS. Ms. Arnold's visits with the children were unsupervised until February of 1995 when Christian returned from a visit with red marks on his buttocks. However,

there was no evidence presented that established that Ms. Arnold had inflicted such marks. At a judicial review held in August of 1995, the juvenile judge emphasized the need for Ms. Arnold to distance herself from Mr. Lynch if he was not willing to cooperate with the Plan of Care. In November of 1995, at the request of DCS, Judge Catalano allowed Ms. Arnold unsupervised visitation with the children.[1]

In January of 1996, the Stokes filed a petition to stop all unsupervised visitation. At a hearing in March of 1996, Judge Catalano questioned the assessment of the case worker, ordered all visitation to be supervised, and appointed a new case worker. In Ms. Arnold's May of 1996 Plan Of Care, DCS indicates that Ms. Arnold had followed through with all recommendations, had never missed a visit with her children, was in therapy, and was compliant in all respects other than her continued contact with Mr. Lynch. In August of 1996, Ms. Arnold's Progress Report states that she had completed various types of counseling, including individual, co-dependent group, couples, parenting, and family intervention, and had visited with the children almost every week since they had been in the custody of DCS. In October of 1996, DCS requested unsupervised visitation. With regard to such request, Judge Catalano asked for a clarification of Ms. Arnold's earlier diagnosis of schizoaffective disorder. After performing a psychiatric evaluation on Ms. Arnold, Dr. Jerry Holland disagreed with the earlier diagnosis of Dr. Peacher and instead found no evidence to support a diagnosis of schizoaffective disorder. In addition, Dr. Sheehan, Ms. Arnold's psychologist for two years, concurred with Dr. Holland's opinion. Dr. Sheehan and Dr. Holland agreed that Ms. Arnold suffers from an adjustment disorder described as a diagnosis of distress symptoms accompanying very difficult situations.

---

[1] The evidence is somewhat confusing with regard to the date of the request for unsupervised visitation made by DCS and the judicial review. A Progress Report dated August 27, 1996 indicates that the request and review occurred in 1996. However, a reading of the entire record reveals that these events actually occurred in 1995.

Although throughout this time period Ms. Arnold had moved several times and held several jobs, her DCS Progress Report on January 6, 1997 states that she had been highly motivated to reunite her family, had been very cooperative with DCS, and had been very concerned about her children's physical and emotional needs. After a judicial review on February 6, 1997, Judge Catalano found that Ms. Arnold "has made considerable progress and such change of circumstances that visitation should be increased and may be unsupervised with an effort made to return said children to the mother's home at the end of the present school term."

At this point, Ms. Arnold was given weekend visitation with the children. Donna Page, Ms. Arnold's case worker at DCS at this time, made unannounced visits to Ms. Arnold's home during every weekend visit, and Ms. Arnold was always there with the children. According to Ms. Page, the home conditions were adequate and safe. The record indicates that the only problems Ms. Arnold faced with regard to weekend visitation were transportation of the children and, on one occasion, money for groceries. However, Ms. Arnold worked with DCS in managing to find a solution to these problems. In March of 1997, Ms. Arnold began a relationship with Henry Sykes. A subsequent home study of Mr. Sykes established his stable work history, ownership of a home, lack of a criminal record, and lack of a history of alcohol or drug abuse.

Ms. Arnold's September 9, 1997 Progress Report states that she had maintained stable employment and a stable residence for over one year, had continued counseling, and was engaged to Mr. Sykes. She had also started paying voluntary support payments of $5.00 per month but the record indicates that she had failed to pay the court ordered amount of $13.66 per month for child support. The report further indicates that there was an allegation of neglect made by the foster parents. However, DCS found this allegation to be unfounded. In March of 1998, Ms. Arnold and Mr. Sykes were married. We note that several

of Ms. Arnold's Progress Reports point out the strong bond between Ms. Arnold and the children and their expressed desire to return home with their mother.

In 1997 the Stokes filed a petition seeking to terminate Ms. Arnold's parental rights and to adopt her three children. DCS and Ms. Arnold each responded to this petition with an Answer asking the court to dismiss the adoption petition because there was not a sufficient basis upon which to terminate Ms. Arnold's parental rights.

On April 2, 1998, a hearing was held to determine whether to terminate Ms. Arnold's parental rights and allow the foster parents to proceed with the adoption of the three children. At the hearing, the trial court heard testimony from a language pathologist establishing Rebecca and Christian's special needs with regard to language and speech therapy. In addition, the court heard testimony that Ms. Arnold had been evicted from at least two different residences in 1996. However, Ms. Page, Ms. Arnold's case worker at DCS, testified that since she was appointed to the case in March of 1996, Ms. Arnold had accomplished everything DCS requested and that she knew of no reason why Ms. Arnold could not parent these children. Dr. Joanne Berryman also testified at the hearing. Dr. Berryman had observed the children interacting with Ms. Arnold on several occasions. Dr. Berryman testified that the bond between the children and Ms. Arnold was very strong and that it would be devastating to the children if Ms. Arnold's parental rights were terminated. Dr. Sheehan testified that in his opinion Ms. Arnold was willing to do what was required in order to properly raise her children even in light of their special needs. Dr. Sheehan further testified that Ms. Arnold had made a lot of progress in developing coping skills for stressful situations with regard to her adjustive disorder. Ms. Arnold herself testified that she is able to provide for the special needs of the children.

Also introduced at the hearing was a report from Dr. William Kenner. In his report, Dr. Kenner noted that Ms. Arnold had been previously diagnosed with schizoaffective disorder. After considering several other doctors' evaluations of Ms. Arnold and conducting one interview with her, Dr. Kenner concluded that Ms. Arnold would not be able to meet the special needs of the children. After consideration of all the proof, the trial court found clear and convincing evidence of the grounds for termination and that termination was in the best interests of the children.

## II.

Our courts have recognized that parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed.2d 551 (1972); *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993). This right is not absolute and may be surrendered when a parent abandons the child or engages in acts that pose a threat of substantial harm to the child. *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994); *O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn. Ct. App. 1995). Due process requires that the parent's conduct allowing the state to terminate the parent-child relationship must be established by clear and convincing evidence. *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed.2d 599 (1982).

Tenn. Code Ann. § 36-1-113 controls the proceedings for the termination of parental rights. The parts relevant to the case at bar are:

> (c) Termination of parental or guardianship rights must be based upon:
> (1) A finding by the court by clear and convincing evidence that the grounds for termination or parental or guardianship rights have been established; and
>
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

Possible grounds for termination of parental rights include the following:

(g)(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4;

(3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

The trial court stated in its final order that the termination of Ms. Arnold's parental rights was based upon two separate and independent grounds: non-compliance with the plan of care, and that the conditions that led to the removal of the children have persisted and are unlikely to improve. On appeal, Ms. Arnold contends that these grounds have not been proven by clear and convincing evidence.

### III.

Ms. Arnold contends that the proof adduced at trial did not rise to the level of substantial non-compliance with the plan of care. We agree.

The Plans of Care in evidence set out various obligations which, for the most part, were fulfilled. Ms. Arnold visited with her children almost every week after they entered the foster care program. The proof at trial showed that Ms. Arnold failed to timely notify DCS of an employment and housing status change on only two occasions. Ms. Arnold attended court reviews and Foster

Care Review Board meetings. Although Ms. Arnold did not attend several doctor appointments made by the foster parents for the children, she did attend therapy sessions with the children and took them to the doctor when needed during visitation. Ms. Arnold completed parenting classes, individual counseling and maintained her medication levels. She obtained a home that was deemed "adequate and safe" by Ms. Page. In fact, Ms. Arnold's May 13, 1996 Plan of Care states that she "has followed through with all recommendations." Ms. Arnold was developing a plan with her therapist to use appropriate coping skills in times of stress. Ms. Arnold maintained employment at a nursing home for eleven months and had several other jobs during the time the children were in foster care. Ms. Arnold worked with a DCS homemaker to establish and maintain a budget. Although Ms. Arnold did not pay the entire amount of child support ordered by the court, she did make voluntary payments of $5.00 per month. At trial, Ms. Page testified that since March of 1996, Ms. Arnold had complied with all requests made by DCS. In light of the foregoing, we find that the record does not establish by clear and convincing evidence that Ms. Arnold did not substantially comply with her plan of care.

### IV.

Ms. Arnold further contends that the evidence failed to prove, by clear and convincing evidence, the elements required for termination under Tenn. Code Ann. § 36-1-113(g)(3).

Ms. Arnold concedes that the children have been removed from her custody for at least six months. Tenn. Code Ann. § 36-1-113(g)(3)(A). With regard to the second and third criteria, relating to the conditions leading to the children's removal from Ms. Arnold's custody, the evidence indicates that the conditions have been somewhat remedied. The children were removed from Ms. Arnold's care after she threatened to commit suicide and take the children with her. The children remained in foster care due to Ms. Arnold's relationship with

-8-

Mr. Lynch, financial status, mental health, and lack of a stable home environment. However, since the initial placement of the children, Ms. Arnold has attended therapy on a consistent basis, attended parenting classes, learned coping abilities for stressful situations, ended any relationship with Mr. Lynch, learned budgeting responsibilities, become involved in a stable relationship, and moved into a house with her husband. In addition, the evidence clearly demonstrated the strong bond between Ms. Arnold and the children. Given the foregoing, we cannot conclude that there is clear and convincing evidence that all of the requirements of Tenn. Code Ann. § 36-1-113(g)(3)(A) have been met.

Although we find the trial court erred in the termination of Ms. Arnold's parental rights, we express no opinion as to whether the custody of the children should be immediately returned to Ms. Arnold. We leave the decision of custody to the Juvenile Court upon remand of this cause.

**V.**

Ms. Arnold next contends that the proof showed that she was indigent and that the trial court erred in denying her petition to proceed in forma pauperis to compel the release of the transcript of the termination of parental rights hearing. We note that our review of the trial court's findings of fact is de novo with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. Pro. 13(d). In the case at bar, the record indicates that at the time of her petition, Ms. Arnold was being supported by her husband and was willfully unemployed. The evidence does not preponderate against the trial court's finding that Ms. Arnold was not indigent. Therefore, denial of her petition to proceed in forma pauperis was proper.

Ms. Arnold further argues that even if not indigent, the trial court erred in not allowing her to purchase a copy of the transcript from DCS. Instead, the court required her to negotiate exclusively with the Stokes. According to a

statement of evidence submitted by Ms. Arnold's attorney, the Stokes and DCS agreed to share in the per diem for the court reporter. Ms. Arnold declined an offer to share in the per diem. This Court has previously found that the appellate rules do not require that a party who has assumed the burden of providing a reporter at trial make available that reporter's work for a party who did not join in providing the reporter. *Estate of Ruby Lee Nichols*, 856 S.W.2d 397 (Tenn. Ct. App. 1993). In addition

> A party who does not join in the engagement and payment of a stenographer has no contract right to require the stenographer to transcribe the record which is therefore unavailable unless and until made available to him on terms satisfactory to the stenographer and the party or parties who engaged the stenographer.

*Beef N' Bird of America, Inc. v. Continental Casualty Co.*, 803 S.W.2d 234, 240 (Tenn. Ct. App. 1990). Therefore, the Stokes were not required to make a copy of the transcript available to Ms. Arnold. However, since DCS also agreed to share in the per diem of the court reporter, DCS had a contract right to a copy of the transcript. Consequently, DCS had the right to allow Ms. Arnold to negotiate with the court reporter for a copy of the transcript or to furnish her a copy, if it chose to do so. We find the trial court erred in ordering Ms. Arnold to negotiate with the Stokes. We do not hold that she had the right to a free transcript, but anything she had to pay beyond her share of the per diem and the cost of transcription would be unreasonable. We remand this cause to the trial court for a determination of whether the amount Ms. Arnold paid for the transcript was reasonable.

## VI.

Ms. Arnold's final contention is that she "should have been allowed to inquire as to the amount of money spent by the foster parents on lawyers, private investigators, expert witnesses and any other money spent to secure the adoption of the children." As we find this determination is totally irrelevant to the termination of her parental rights, we decline to address this issue.

## VII.

In their brief, the Stokes assert that they, as foster parents, along with the children, have a fundamental liberty interest in their existing familial relationship. However, as stated earlier, in Tennessee it has long been established that biological parents have a fundamental liberty interest in the care and custody of their children. *Hawk*, 855 S.W.2d at 577. In addition, this Court has previously held that these "parental rights are superior to the rights of others and continue without interruption unless a biological parent consents to relinquish them, abandons his or her child, or forfeits his or her parental rights by some conduct that substantially harms the child." *O'Daniel*, 905 S.W.2d at 186. As we have found no grounds upon which to base the termination of Ms. Arnold's parental rights, any interest the Stokes or the children might have in their relationship as a foster family is outweighed by Ms. Arnold's fundamental liberty interest in the custody, companionship, and care of her children.

## VIII.

The judgment of the trial court is vacated. We remand this cause to the trial court for further proceedings consistent with this opinion. Costs on appeal are assessed against appellees, Barry and Pamela Stokes.

 

_____
BEN H. CANTRELL,
PRESIDING JUDGE, M.S.

_____
CONCUR:


_____
WILLIAM C. KOCH, JR., JUDGE


_____
PATRICIA J. COTTRELL, JUDGE