IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 7, 2004 Session

### IN RE C.M.M. & S.D.M.

**Appeal from the Juvenile Court for Houston County**
**No. 2034      W. Sidney Vinson, III, Judge**

---

**No. M2003-01122-COA-R3-PT - Filed March 9, 2004**

---

This appeal involves the termination of a mother's parental rights with regard to two of her six children. Less than four months after the Tennessee Department of Children's Services was granted temporary custody of the children, their foster parents filed a petition in the Juvenile Court for Houston County seeking permanent custody and the termination of the parental rights of the biological parents. The children's mother contested the petition, but the father did not. Following a hearing, the juvenile court terminated the parental rights of both parents. The mother has appealed. We have determined that the order terminating the mother's parental rights must be vacated because the record does not contain clear and convincing evidence that the Department made reasonable efforts to reunite the mother with her children.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Vacated**

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which PATRICIA J. COTTRELL and FRANK G. CLEMENT, JR., JJ., joined.

Drew W. Taylor, Erin, Tennessee, for the appellant, M.M.

Paul G. Summers, Attorney General and Reporter, and Juan G. Villaseñor, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.**

M.M. dropped out of the ninth grade in 1994 when she married T.M. She was fifteen years old at the time; he was eighteen. They lived in Nashville and, between 1995 and 1999, four children were born in quick succession. T.M. deserted the family in 2000, leaving M.M. pregnant with their fifth child. M.M., who had not worked outside the home during the marriage, was left without any financial support. She gave birth to her fifth child in May 2001.

M.M. and T.M.'s married life was far from stable. As M.M. described it, they had a number of "pothead" friends, and both of them apparently used marijuana. In addition, T.M. left home frequently. During particularly difficult periods, M.M. began leaving her children with her mother, A.D.E., who lived in Tennessee Ridge in Houston County, approximately seventy-five miles from

Nashville. The length of these stays became longer and longer as time passed, and the children eventually began living with A.D.E. after M.M. was incarcerated for shoplifting.

The Houston County office of the Department of Children's Services intervened after receiving reports regarding the conditions in which the children were living at A.D.E.'s house. After determining that A.D.E. had several serious medical problems and that the family was "financially challenged," the Department arranged for homemaker services to assist A.D.E. and made arrangements to provide day care for the children. Despite these efforts, A.D.E.'s ability to care for the children properly did not improve.[1]

By August 2001, A.D.E. was attempting to care for six children under the age of six. Five of these children were M.M.'s children, and one of them was the two-year-old son of one of A.D.E.'s other children. On August 29, 2001, the Department filed a petition in the Houston County Juvenile Court seeking temporary protective custody of all six children because they were dependent and neglected. The Department based its petition on the unsanitary conditions in A.D.E.'s home, her poor heath, and her inappropriate conduct toward the children.

The juvenile court granted an ex parte order removing the children from A.D.E.'s home and placing them in the temporary custody of the Department. M.M.'s three oldest children were placed in a therapeutic foster home in Unionville, approximately forty-five miles from Nashville. Her two youngest children, who are the focus of this appeal, C.M.M.[2] and S.D.M.,[3] were placed initially in a foster home in Clarksville, over fifty miles from Nashville. On September 5, 2001, C.M.M. and S.D.M. were placed with E.E. and L.E. who lived in Antioch. E.E. and L.E. were social acquaintances of both A.D.E. and M.M. who had cared for C.M.M. and S.D.M. for a number of weekends while the children were still living with A.D.E.

On September 25, 2001, the Department met with M.M., T.M., and A.D.E. to develop a permanency plan designed to place the five children with a relative and to return them eventually to their parents.[4] Returning the children to M.M. was not immediately feasible because she had no home and was unemployed. In addition, she had no automobile, her driver's license had been

---

[1] In an assessment completed in September 2001, the Department concluded that "it appears family [A.D.E.] reached peak of functioning, and possibly would backslide with diminished services. Some collaterals felt . . . [A.D.E.] was resistant to services; this CM [case manager] can only report reception and cooperation."

[2] C.M.M. was born on November 10, 1999.

[3] S.D.M. was born on May 9, 2001.

[4] Apparently the Department's employees did not correctly fill out either the initial or the revised permanency plan forms. On the initial plan form, the employee checked a box indicating "relative placement" as a "permanency goal" but did not check the box indicating that "return to parent" was also a goal. Likewise, the employee who completed the revised permanency plan form checked the boxes indicating that "relative placement" and "adoption" were the permanency goals but did not check the box indicating "return to parent" as a permanency goal. The Department's lawyer represented to the court during oral argument that the failure to check the box indicating that "return to parent" was a permanency goal was an oversight and that reuniting C.M.M. and S.D.M. with M.M. had, in fact, been a permanency goal from the beginning. This concession undermines the Department's rather curious assertion in footnote 9 of its brief that it made extensive efforts to reunite M.M. with her children even though it was not required to do so.

revoked, and she had limited access to other transportation. The plan called for M.M., T.M., and A.D.E. to complete an alcohol and drug assessment, to follow up all treatment recommendations, and to submit to periodic, random tests to verify sobriety. It also obligated them to find suitable housing, to establish a means to support the children either through employment or public assistance, and to attend parenting classes. This plan anticipated that it would take one year for M.M., T.M., and A.D.E. to accomplish these tasks.

The Department revised the permanency plan less than three months later. The revised plan, dated December 4, 2001, added adoption as a possible outcome.[5] In addition to the tasks assigned in the initial plan, the revised plan required M.M. and T.M. to have a physical screening to verify that they were physically able to care for the children, to attend family planning counseling, to visit the children regularly, and to attend all meetings, staffings, and court hearings involving the children. The revised plan retained the September 2002 deadline for completing these tasks that had been established in the initial plan.

On December 17, 2001, E.E. and L.E., the children's foster parents, hired a lawyer and filed a petition in the juvenile court seeking permanent custody and to terminate M.M.'s and T.M.'s parental rights with regard to C.M.M. and S.D.M.[6] Even though they named M.M., T.M., and the Department as defendants, they served the petition on only the Department and T.M. The record contains no indication why the foster parents did not attempt to serve M.M. or that M.M. knew that the petition had been filed.[7]

In its January 2002 progress report, the Department noted that M.M. and T.M. were visiting their children regularly and that their interactions with the children were appropriate. While the Department catalogued efforts by T.M. and A.D.E. to complete the tasks set out for them in the revised permanency plan, it reported that M.M. had not provided "any evidence that she has made attempts to complete the tasks listed on the current permanency plan." M.M. became pregnant with her sixth child in early 2002.[8]

During this period, M.M. was living with various friends and family members and was concentrating on finding suitable housing for herself and her children. After she moved in with her

---

[5]The revised plan stated that the Department had not yet identified an adoptive family.

[6]Only parties with statutory authorization have standing to file petitions to terminate parental rights. *Osborn v. Marr*, ___ S.W.3d ___, ___, 2004 WL 103224, at \*4 (Tenn. 2004). Foster parents are not among the class of persons authorized by Tenn. Code Ann. § 36-1-113(b) (Supp. 2003) to file termination petitions; however, "prospective adoptive . . . parents" are. In light of the allegation in their petition that they are "potential adoptive parents" of C.M.M. and S.D.M., L.E. and E.E. have standing to seek to terminate the parental rights of M.M. and T.M. with regard to these two children.

[7]Private parties authorized to seek termination of parental rights regarding children in the Department's custody need not name the Department as a defendant. When they do not, Tenn. Code Ann. § 36-1-113(h)(1) requires the Department to seek to be joined as a party unless it decides to decline to participate for one or more of the reasons listed in Tenn. Code Ann. § 36-1-113(h)(2). Because the foster parents named that Department as a defendant, the Department was a proper party to this proceeding.

[8]There is some question regarding the identity of this child's biological father.

aunt and uncle in the Dickerson Road area, she tried unsuccessfully to find work at various businesses within walking distance of her residence. M.M. stopped associating with her "pothead" acquaintances. She had a mental health and alcohol and drug assessment at an outpatient treatment facility in Nashville and was diagnosed with bipolar disorder. She also enrolled in Families First.

The Department's April 2002 progress report noted that M.M. and T.M. were continuing supervised visits with their children. It recounted that M.M. had completed an alcohol and drug assessment and had started parenting classes and counseling. However, it also stated that M.M. had not attended the parenting classes or counseling "for some time," that she had not had a physical examination, and that she had not found suitable employment or housing. In a letter to the juvenile court in August 2002, the Department reported that M.M. had "made little progress reaching . . . [her] goals" and that she had "not advanced at all on . . . [her] permanency plan goals since . . . [the] Foster Care Review in April 2002."[9] The Department informed the juvenile court that it intended to give M.M. six months to complete her tasks and that it would file a petition to terminate her parental rights "[i]f there is not significant progress made on these tasks."

The juvenile court conducted a hearing on August 14, 2002 focused on M.M.'s and T.M.'s progress with their tasks. T.M. stated that he would be willing to surrender C.M.M. and S.D.M. but not his three oldest children. M.M. insisted that she would not willingly give up her children. During the hearing, E.E. and L.E. served M.M. with their petition to terminate her parental rights, and the juvenile court appointed a lawyer for M.M.[10]

Shortly after the hearing, M.M. began an intensive outpatient counseling program as well as a case management program in Nashville. She failed to attend the sessions regularly because, as she explained later, she "had a lot of stuff going on." She was discharged from both programs in November 2002 because her "level of disorder" was too high and because of lack of attendance.

The juvenile court conducted a hearing on E.E.'s and L.E.'s petition to terminate M.M.'s parental rights on November 22, 2002. The Department announced that it favored terminating M.M.'s rights. During the hearing, M.M. conceded that she did not have adequate housing and that she was unable to financially support her children.[11] She stated that she blamed herself for her predicament and that she had been "trying to do everything that they want me to do; I'm just limited

---

[9]Specifically, the Department noted that "[M.M.] has not completed her parenting classes, has not addressed her A & D issues, has not found suitable housing, does not have reliable transportation and is not employed. [M.M.] did complete an A & D assessment and started parenting classes and counseling but has not finished any of these tasks. Additionally, [M.M.] is pregnant again. She has expressed an interest in having this baby adopted. This worker has provided her with a name and phone number of someone at the Center for Adoptions if she is interested in pursuing this route."

[10]Until this point, M.M. had not been represented by counsel.

[11]She testified that a relative was "pulling strings" and that she was assured of a cashier's job at Wal-Mart as soon as she had her baby.

to access." She also stated that her children were "better off" with E.E. and L.E. because they were "rich" and that she wanted the foster parents to keep the children until she got a job.[12]

On December 23, 2002, the juvenile court filed its order terminating M.M.'s and T.M.'s rights with regard to C.M.M. and S.D.M. The court concluded that the Department and the foster parents had presented clear and convincing evidence of three grounds to terminate M.M.'s and T.M.'s parental rights[13] and that the interests of C.M.M. and S.D.M. would be best served by terminating M.M.'s parental rights. M.M. has appealed from this order.

## II.
### THE STANDARDS FOR REVIEWING TERMINATION ORDERS

A biological parent's[14] right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions.[15] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060 (2000); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993); *Ray v. Ray*, 83 S.W.3d at 731. While this right is fundamental and superior to the claims of other persons and the government, it is not absolute. It continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination. *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002); *Stokes v. Arnold*, 27 S.W.3d 516, 520 (Tenn. Ct. App. 2000); *O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn. Ct. App. 1995).

Termination proceedings in Tennessee are governed by statute. Parties who have standing to seek the termination of a biological parent's parental rights must prove two things. First, they must prove the existence of at least one of the statutory grounds for termination.[16] Tenn. Code Ann. § 36-1-113(c)(1); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *Jones v. Garrett*, 92 S.W.3d at 838. Second, they must prove that terminating the parent's parental rights is in the child's best interests.[17] Tenn. Code Ann. § 36-1-113(c)(2); *In re A.W.*, 114 S.W.3d 541, 544 (Tenn. Ct. App.

---

[12] M.M. also suggested during the hearing that another uncle who lived in Madison, Tennessee had indicated that he and his wife would be willing to take in all five of her children.

[13] Tenn. Code Ann. §§ 36-1-113(g)(1), (2), and (3)(A).

[14] This right exists notwithstanding the marital status of the child's biological parents who have established or are attempting to establish a relationship with the child. *Lehr v.Robertson*, 463 U.S. 248, 262, 103 S. Ct. 2985, 2993-94 (1983); *Jones v. Garrett*, 92 S.W.3d 835, 840 (Tenn. 2002) (extending the right to biological fathers who have grasped the opportunity to develop a relationship with the child); *In re Swanson*, 2 S.W.3d 180, 188 n.12 (Tenn. 1999); *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001). The right also extends to adoptive parents. *Simmons v. Simmons*, 900 S.W.2d 682, 684 (Tenn. 1995).

[15] U.S. Const. amend. XIV, § 1; Tenn. Const. art. I, § 8.

[16] The statutory grounds for terminating parental rights are found in Tenn. Code Ann. § 36-1-113(g) (Supp. 2003).

[17] The factors to be considered in a "best interests" analysis can be found in Tenn. Code Ann. § 36-1-113(i).

2003); *In re C.W.W.*, 37 S.W.3d 467, 475-76 (Tenn. Ct. App. 2000); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

No civil action carries with it graver consequences than a petition to sever family ties indelibly and forever. Tenn. Code Ann. § 36-1-113(l)(1); *M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 565 (1996); *In re Knott*, 138 Tenn. 349, 355, 197 S.W. 1097, 1098 (1917); *In re D.D.K.*, No. M2003-01016-COA-R3-PT, 2003 WL 23093929, at *8 (Tenn. Ct. App. Dec. 30, 2003). Because the stakes are so profoundly high, Tenn. Code Ann. § 36-1-113(c) requires persons seeking to terminate a biological parent's parental rights to prove all the elements of their case by clear and convincing evidence. This heightened burden of proof minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d at 622. Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, *State Dep't of Children's Servs. v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003) (No Tenn. R. App. P. 11 application filed), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *In re C.D.B.*, 37 S.W.3d 925, 927 (Tenn. Ct. App. 2000). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d at 733; *In re C.W.W.*, 37 S.W.3d at 474.

Because of the gravity of their consequences, proceedings to terminate parental rights require individualized decision-making. *In re Swanson*, 2 S.W.3d at 188. Accordingly, Tenn. Code Ann. § 36-1-113(k) explicitly requires courts terminating parental rights to "enter an order which makes specific findings of fact and conclusions of law" whether they have been requested to do so or not. *In re Adoption of Muir*, No. M2002-02963-COA-R3-CV, 2003 WL 22794524, at *3 (Tenn. Ct. App. Nov. 25, 2003) (No Tenn. R. App. P. 11 application filed). These specific findings of fact and conclusions of law facilitate appellate review and promote just and speedy resolution of appeals. When a lower court has failed to comply with Tenn. Code Ann. § 36-1-113(k), the appellate courts must remand the case with directions to prepare the required findings of fact and conclusions of law. *In re D.L.B.*, 118 S.W.3d at 367; *In re K.N.R.*, No. M2003-01301-COA-R3-PT, 2003 WL 22999427, at *5 (Tenn. Ct. App. Dec. 23, 2003).

Because of the heightened burden of proof required by Tenn. Code Ann. § 36-1-113(c), we must adapt Tenn. R. App. P. 13(d)'s customary standard of review for cases of this sort. First, we must review the trial court's specific findings of fact de novo in accordance with Tenn. R. App. P. 13(d). Thus, each of the trial court's specific factual findings will be presumed to be correct unless the evidence preponderates otherwise. Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights. *Jones v. Garrett*, 92 S.W.3d at 838; *In re Valentine*, 79 S.W.3d at 548-49; *In re Adoption of Muir*, 2003 WL 22794524, at *2; *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *9-10 (Tenn. Ct. App. June 3, 2003) (No Tenn. R. App. P. 11 application filed); *Ray v. Ray*, 83 S.W.3d at 733;

*In re L.S.W.*, No. M2000-01935-COA-R3-JV, 2001 WL 1013079, at *5 (Tenn. Ct. App. Sept. 6, 2001), *perm. app. denied* (Tenn. Dec. 27, 2001).[18]

<h1 style="text-align:center">III.</h1>

## THE DEPARTMENT'S STATUTORY OBLIGATION TO MAKE REASONABLE EFFORTS TO REUNITE CHILDREN WITH THEIR BIOLOGICAL PARENTS

There is a need to address the relationship between Tenn. Code Ann. § 36-1-113 and Tenn. Code Ann. § 37-1-166 regarding the Department's obligation to preserve, repair, and restore parent-child relationships. The Department's brief implies that the "reasonable efforts" required by Tenn. Code Ann. § 37-1-166 are somehow qualitatively and quantitatively different from the "reasonable efforts" referred to in Tenn. Code Ann. § 36-1-113. The Department is not required in every case to preserve or repair the parent-child relationship. However, once the Department undertakes this obligation, the courts should employ the same standards to determine whether the Department's remedial efforts have been reasonable.

The concept of family is one of the fundamental building blocks of our society. Tenn. Code Ann. § 36-3-113(a) (2001). Parental autonomy is the cornerstone of this concept. *Moore v. City of East Cleveland*, 431 U.S. 494, 499, 97 S. Ct. 1932, 1935 (1977); *Davis v. Davis*, 842 S.W.2d 588, 601 (Tenn. 1992); *State ex rel. Cihlar v. Crawford*, 39 S.W.3d 172, 182 (Tenn. Ct. App. 2000). Thus, public policy strongly favors permitting parents to raise their children as they see fit, free from unwarranted governmental interference. *Bellotti v. Baird*, 443 U.S. 622, 638, 99 S. Ct. 3035, 3045 (1979); *Hawk v. Hawk*, 855 S.W.2d at 579; *State ex rel. T.H. v. Min*, 802 S.W.2d 625, 626 (Tenn. Ct. App. 1990).

Because of the importance of family relationships, the General Assembly has recognized that children should not be separated from their parents unless separation is necessary for the children's welfare or in the interest of public safety. Tenn. Code Ann. §§ 37-1-101(a)(3), 37-2-401(a) (2001). Even the statutes defining the circumstances when the State may intervene in the parent-child relationship reflect the General Assembly's policy decisions that separating parents and children should be a remedy of last resort, that the Department should make "reasonable efforts" to preserve, repair, or restore parent-child relationships whenever reasonably possible, and that the juvenile court must independently determine that the remedial efforts the Department proposes to engage in are reasonable.

The Department is not required, however, to make reasonable efforts to reunite a parent with his or her child every time it removes a child from his or her parent's custody. For example, in

---

[18]These decisions draw a distinction between specific facts and the combined weight of these facts. Tenn. R. App. P. 13(d) requires us to defer to the trial court's specific findings of fact as long as they are supported by a preponderance of the evidence. However, we are the ones who must then determine whether the combined weight of these facts provides clear and convincing evidence supporting the trial court's ultimate factual conclusion. The Tennessee Supreme Court used this approach in *In re Valentine* when it recognized the difference between the conclusion that a biological parent had not complied substantially with her obligations in a permanency plan and the facts relied upon by the trial court to support this conclusion. *In re Valentine*, 79 S.W.3d at 548-49; *see also Jones v. Garrett*, 92 S.W.3d at 838.

certain well-defined "aggravated circumstances,"[19] the Department may reasonably forego efforts to reunify the family and immediately begin proceedings to terminate the parents' parental rights. Likewise, other grounds for terminating parental rights do not necessitate that the Department make reasonable reunification efforts before filing a termination petition.[20]

Unless permitting a child to remain with his or her parents will expose the child to a substantial risk of harm, the Department must make "reasonable efforts" to "prevent the need for removal of the child from such child's family" before it separates a child from his or her parents. Tenn. Code Ann. § 37-1-166(a)(1). Once the Department separates a child from his or her parents, its first priority must be to restore the family unit if at all possible.[21] Thus, the Department must make "reasonable efforts" to make it "possible for the child to return safely to the child's home." Tenn. Code Ann. §§ 37-1-166(a)(2), -166(g)(2). The Department may even delay termination proceedings if it decides it has not had sufficient opportunity to make "reasonable efforts" to provide the services needed to enable the child to return home safely. Tenn. Code Ann. § 36-1-113(h)(2)(C). Finally, in cases where reasonable remedial efforts are required, the Department may support its claim that terminating a parent's parental rights is in a child's best interest by introducing evidence that the parent "has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible." Tenn. Code Ann. § 36-1-113(i)(2).

Statutes relating to the same subject matter should be construed together to advance their common purpose. *Frye v. Blue Ridge Neuroscience Ctr., P.C.*, 70 S.W.3d 710, 716 (Tenn. 2002); *Mitchell v. Campbell*, 88 S.W.3d 561, 566 n.7 (Tenn. Ct. App. 2002). All the statutes defining the Department's prerogatives and obligations in connection with separating children from their parents and terminating the parents' parental rights share a common purpose.[22] Accordingly, the "reasonable

---

[19]These circumstances include "severe child abuse" as defined in Tenn. Code Ann. § 37-1-102 (Supp. 2003); the "aggravated circumstances" defined in Tenn. Code Ann. § 36-1-102(9); the commission of murder, voluntary manslaughter, or felony assault resulting in serious bodily injury of a child's sibling or half-sibling as proscribed in Tenn. Code Ann. § 37-1-166(g)(4)(B); and parents found criminally or civilly liable for the death of the child's other parent or guardian pursuant to Tenn. Code Ann. § 36-1-113(g)(7) .

[20]See, *e.g.*, Tenn. Code Ann. § 36-1-113(g)(5), (6) (parent's incarceration); Tenn. Code Ann. § 36-1-113(g)(8) (parent with impaired mental capacity).

[21]*In re D.D.K.*, No. M2003-01016-COA-R3-PT, 2003 WL 23093929, at *4 (Tenn. Ct. App. Dec. 30, 2003); *In re D.D.V.*, No. M2001-02282-COA-R3-JC, 2002 WL 225891, at *8 (Tenn. Ct. App. Feb. 14, 2002) (No Tenn. R. App. P. 11 application filed); *In re Drinnon*, 776 S.W.2d 96, 99-100 (Tenn. Ct. App. 1988).

[22]The interlocking relationship between Tenn. Code Ann. § 36-1-113 and 37-1-166 is also reflected in each statute's references to the other. Tenn. Code Ann. § 36-1-113(a), for example, states that in addition to the grounds for termination in Tenn. Code Ann. § 36-1-113(g), parental rights may be terminated based on the grounds "in title 37, chapter 1, part 1 and title 37, chapter 2, part 4." By the same token, Tenn. Code Ann. § 37-1-166(g)(4) specifically refers to definitions in Tenn. Code Ann. §§ 36-1-102, -113.

efforts" required by Tenn. Code Ann. § 37-1-166 are precisely the same sort of "reasonable efforts" required by Tenn. Code Ann. § 36-1-113.[23]

The Department's statutory obligation to make "reasonable efforts" to preserve, repair, or restore parent-child relationships need not be "Herculean."[24] The General Assembly has defined "reasonable efforts" as "the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). The reasonableness of the Department's efforts must be decided on a case-by-case basis. Determining whether the Department's efforts have been reasonable requires the courts to consider, among other factors: (1) the reasons for separating the parent from his or her child or children, (2) the parent's physical and mental abilities, (3) the resources available to the parent, (4) the parent's efforts to remedy the conditions that required the separation, (5) the resources available to the Department, (6) the duration of the parent's remedial efforts, and (7) the closeness of the fit between the conditions that led to the initial separation, the requirements in the permanency plan, and the Department's efforts.[25]

In many circumstances, the success of a parent's remedial efforts is intertwined with the efforts of the Department's staff to provide assistance and support. *State Dep't of Children's Servs. v. Demarr*, 2003 WL 21946726, at *10. Reasonable efforts entail more than simply providing parents with a list of service providers and sending them on their way. The Department's employees must use their superior insight and training to assist parents with the problems the Department has identified in the permanency plan, whether the parents ask for assistance or not. *In re D.V.V.*, 2002 WL 225891, at *8. However, the remedial responsibility does not rest solely on the Department's shoulders. Parents must also make reasonable efforts to rehabilitate themselves and to remedy the conditions that required them to be separated from their children. *In re R.C.V.*, 2002 WL 31730899, at *12.

We have already pointed out that the Department's obligation to make reasonable efforts to preserve, repair, or restore a parent-child relationship is not implicated in every termination

---

[23]On several occasions, this court has pointed out that Tenn. Code Ann. § 36-1-113(i) is "more pertinent" to termination proceedings than Tenn. Code Ann. § 37-1-166. *In re A.W.*, 114 S.W.3d at 545; *State Dep't of Children's Servs. v. L.L.T.*, No. E2003-00501-COA-R3-JV, 2003 WL 23094559, at *5 (Tenn. Ct. App. Dec. 30, 2003). We do not construe these decisions to mean that Tenn. Code Ann. § 36-1-113 and Tenn. Code Ann. § 37-1-166 should not be read in pari materia. We have repeatedly relied on Tenn. Code Ann. § 37-1-166 in termination proceedings. *In re R.C.V.*, No. M2001-02102-COA-R3-JV, 2002 WL 31730899, at *12 (Tenn. Ct. App. Nov. 18, 2002) (No Tenn. R. App. P. 11 application filed); *In re D.D.V.*, 2002 WL 225891, at *8.

[24]*State Dep't of Children's Servs. v. Malone*, No. 03A01-9706-JV-00224, 1998 WL 46461, at *2 (Tenn. Ct. App. Feb. 5, 1998), *perm. app. denied* (Tenn. June 8, 1998). This court has, however, reviewed records depicting conduct of Department employees that could easily be characterized as "Herculean."

[25]Efforts directed toward matters of little consequence are not reasonable. *See In re Valentine*, 79 S.W.3d at 548-49 (a permanency plan must be reasonable and must be related to remedying the conditions that led to the removal in the first place).

proceeding.[26] However, when the termination proceeding involves grounds that implicate the Department's obligation,[27] establishing that it made reasonable efforts to reunite the child with his or her parents is an essential ingredient of the Department's case. In these cases, the Department has the burden of proving its reasonable efforts even when the parent has not questioned the adequacy of its efforts. *See* Tenn. Code Ann. § 37-1-166(b).[28]

When required, the Department must establish that it has made reasonable efforts to reunite the child with his or her parents by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c). This heightened burden of proof does not alter the standard by which the Department's efforts will be judged – the "reasonableness" standard. Rather, it simply requires the Department to present sufficient evidence regarding its reunification efforts to enable the trier-of-fact to conclude, without any serious or substantial doubt, that the Department's remedial efforts were reasonable under all the circumstances.

Tenn. Code Ann. § 37-1-166(c)(2) and (3) address the procedure for proving the reasonableness of the Department's reunification efforts. The Department must file with the court an affidavit identifying the specific services determined to be necessary to reunite the family, as well as the services that have actually been provided to the parents and the child. The affidavit must also address whether the Department has had a reasonable opportunity to provide the needed services to the family and, if not, the reasons why the services have not been provided. Tenn. Code Ann. § 37-1-166(c)(4).

A properly prepared and appropriately detailed affidavit meeting the requirements of Tenn. Code Ann. § 37-1-166(c)(4) should be sufficient to establish the reasonableness of the Department's reunification efforts by clear and convincing evidence. Thus, unless a parent asserts that the Department's efforts were not reasonable, the Department is not required to present additional evidence regarding its remedial efforts. However, if a parent takes issue with the adequacy of the Department's efforts, the Department may be required to put on evidence other than the affidavit regarding its efforts and to make its employees and contractors involved in these efforts available for cross-examination at trial.[29]

The Department must comply strictly with all statutory requirements when it seeks to terminate a parent's parental rights. *In re D.D.K.*, 2003 WL 23093929, at *8. However, its failure

---

[26]Termination proceedings based on the grounds in Tenn. Code Ann. § 36-1-113(g)(4) - (8) usually will not require the Department to demonstrate that it has made reasonable efforts to reunite a child with his or her parents.

[27]Typically, termination proceedings based on the grounds in Tenn. Code Ann. § 36-1-113(g)(1) - (3) generally require the Department to demonstrate that it has made reasonable efforts to reunite a child with his or her parents.

[28]Tenn. Code Ann. § 37-1-166(b) applies to any proceeding to determine whether a child should remain in the Department's custody. The statute is broad enough to cover termination proceedings brought by the Department because these proceedings result in placing the child in the Department's custody prior to adoption.

[29]To avoid delay, a court presiding over a termination case may, with or without the request of the Department, require a parent to put the Department on notice in a timely manner that he or she is challenging the reasonableness of the Department's reunification efforts.

to file the affidavit of reasonable efforts required by Tenn. Code Ann. § 37-1-166(c) is not fatal if the Department introduces competent evidence specifically identifying the services required in the permanency plan, the services actually provided to the parents, and the outcomes of these services. *In re T.B.S.*, ___ S.W.3d ___, ___, 2003 WL 21338699, at *6 (Tenn. Ct. App. June 10, 2003). Simply introducing copies of the contents of the Department's file will not suffice. *See In re R.C.V.*, 2002 WL 31730899, at *8 (questioning the admissibility of testimony from a case manager testifying from the Department's records rather than personal experience).[30]

The Department's statutory responsibility to present specific evidence regarding the reasonable efforts made to reunite families enables the courts to reach their own independent conclusion regarding the adequacy of the Department's efforts. Without specific information provided by the Department, it is difficult, if not impossible, for the courts to make the specific findings and conclusions they are required to make regarding the adequacy and reasonableness of the Department's efforts to reunify the families.[31]

## IV.
### THE EVIDENCE REGARDING THE REASONABLENESS OF THE DEPARTMENT'S EFFORTS

The record contains only shadows of the efforts the Department may have made to reunify M.M. and her children. The only affidavit of reasonable efforts in the record was prepared in August 2001 and dealt only in the most general terms with the services provided to A.D.E. before the Department removed the children from her home. The affidavit does not mention the services provided directly to M.M. between September 2001 and November 2002. Likewise, the initial and revised permanency plans prepared in September 2001 and December 2001 identify the services made available to M.M. only in the most general terms and, for the most part, fail to identify the persons responsible for seeing to it that the services were provided. The other documents in the record contain few details regarding the service providers, the services being provided, M.M.'s efforts to avail herself of the services, or the success of M.M.'s efforts.

The documentary shortcomings of the Department's case were not cured by the evidence it offered at the termination hearing. The only case manager called to testify conceded that she had not staffed M.M.'s permanency plans and that she had not made any of the service referrals herself.[32] She could not recall whether she made suggestions regarding the services that should be offered to M.M. The case manager also admitted that she did not know who had referred M.M. to parenting classes or family counseling and that she was not familiar with all the services that had been

---

[30]All evidence admissible at permanency plan hearings, including written reports, is admissible in termination proceedings. *See* Tenn. Code Ann. § 37-2-409(b)(2) (Supp. 2003). However, Tenn. Code Ann. § 37-1-129(d) (2001), requires the Department to afford the parents or their lawyers with an opportunity to examine and controvert the written reports and to cross-examine the individuals making the reports.

[31]Tenn. Code Ann. §§ 36-1-113(k), 37-1-166(d)(2).

[32]Curiously, the social worker who had staffed the plans and made the referrals was present in court but was not called to testify about her efforts to reunify M.M. and her children.

provided. Finally, the case manager offered no evidence regarding the Department's efforts to assist M.M. with finding suitable housing or obtaining stable employment.[33]

Because of the shortcomings in the Department's case, the juvenile court was unable to compare the individualized services M.M. needed with the Department's efforts to provide her with these services. Accordingly, the juvenile court could not make the specific findings of fact and conclusions of law regarding the reasonableness of the Department's efforts required by Tenn. Code Ann. §§ 36-1-113(k) and 37-1-166(d)(2). Its termination order contains only generalizations regarding the Department's efforts to assist M.M. and the adequacy of these services. With the case in this posture, we are unable to make an independent determination that, in the words of Tenn. Code Ann. § 36-1-113(i)(2), M.M. has "failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible."

## V.

Because of the shortcomings in the Department's case regarding its efforts to reunify M.M. and her children, we vacate the portion of the December 23, 2002 order terminating her parental rights and remand the case to the juvenile court for further proceedings. On remand, the court may conduct a new trial on the foster parents' termination petition or take whatever other action it deems warranted. We tax the costs of this appeal to the Department of Children's Services.

_____

WILLIAM C. KOCH, JR., P.J., M.S.

---

[33]M.M. did not testify about the Department's efforts to assist her with housing or employment. However, she stated that she selected her physician herself and that she was required to use the telephone book to find an agency that would provide her with mental health counseling.