IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 14, 2004 Session

**In the matter of:  M.E., M.E., R.B., M.B., S.B.**

**Appeal from the Juvenile Court for Davidson County**
**No. 9619-30414, -30416, -30417, -30418, -30419     Betty K. Adams, Judge**

**No. M2003-00859-COA-R3-PT - Filed August 16, 2004**

Mother and father of three children appeal termination of their respective parental rights.  Mother appeals arguing that the trial court erred in finding persistence of conditions sufficient to terminate her rights.  We reverse, finding that the Department failed to make reasonable efforts to reunite Mother with her children.  Father appeals alleging that he was denied counsel and/or the effective assistance of counsel.  The trial court appointed counsel to represent Father but thereafter relieved appointed counsel without stating a basis and did not appoint substitute counsel.  Father retained an attorney on the eve of trial but this retained attorney only appeared on four of the seven days of trial and was absent during significant portions of the days he attended.  Since the trial court initially found that Father was entitled to appointed counsel and never made a finding that Father was no longer entitled to appointed counsel or that he had waived the right to counsel, we find that the trial court erred when it failed to appoint substitute counsel.  Father attempted to retain counsel; however, retained counsel's repeated failures to attend the hearings was equivalent to Father having no counsel.  Thus, Father was deprived of the right to counsel.  Accordingly, we vacate the judgment terminating Father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court is Reversed**

FRANK G. CLEMENT, JR., J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and PATRICIA J. COTTRELL, J., joined.

Thomas H. Miller, Franklin, Tennessee, for the appellant, D.B., the mother.

Merrilyn Feirman, Nashville, Tennessee, for the appellant, L.B., the father.[1]

Paul G. Summers, Attorney General and Reporter;  Dianne Stamey Dycus, Deputy Attorney General, Elizabeth C. Driver, and Patricia Arnold Mayes, for the appellee, Tennessee Department of Children's Services.

---

[1]Ms. Feirman was appointed to represent the father on appeal.  She was not his trial counsel.

# OPINION

The Department of Children's Services (the Department) filed a petition to terminate the parental rights of the mother and father of three children.[2]

Mother presents two issues:[3]

1)      Whether there was persistence of conditions that prevented the children's return to the mother.

2)      Whether the court erred in finding that termination was in the best interests of three of the children.

Father presents two issues:

1)      Whether the trial court erred by requiring Father to go forward with the trial without the aid of counsel, thereby denying him his constitutional and statutory right to counsel.

2)      Whether Father was denied the effective assistance of counsel when his attorney failed to appear in court on four trial days.

This case has a protracted, disjointed and confusing history that goes back to 1994 when the then Department of Human Services investigated allegations of child abuse by Father. Following an apparently brief investigation, little was documented until October 31, 1996, when the eldest daughter was referred to Our Kids for medical-legal evaluation after an alleged sexual assault. On November 8, 1996, the Department filed a Petition for Adjudication of Neglect and Abuse and Request for Protective Order due to an alleged sexual assault. On November 25, 1996, Father was

---

[2]The Department sought termination of Mother's parental rights to her five children. It also sought termination of the parental rights of the two men who were the fathers of the children. L.B., an appellant, is the father of Mother's three younger children, R.B., M.B. and S.B. Another man, L.E., who does not appeal, was the father of Mother's two older children, M.E. and M.E. The juvenile court terminated both men's parental rights to all of their children but only terminated Mother's rights to her three younger children, R.B., M.B. and S.B., finding that termination of Mother's parental rights to her two older children, M.E. and M.E., was not in the children's best interest.

[3]Mother presented four issues; however, the Department conceded two of the issues presented by Mother. In its brief, the Department stated:

Although the Juvenile Court also found grounds to terminate [Mother's] parental rights on the basis of abandonment due to failure to support, the Court did not make a specific finding as to willful intent. Accordingly, [the Department] will not pursue this ground on appeal. In addition, the Juvenile Court did not make a specific finding that [Mother's] parental rights should be terminated for failure to substantially comply with the requirements of the Permanency Plan. The trial court found that [Mother] only minimally complied with the Plan but that [the Department] did little to assist her in accomplishing the responsibilities.

restrained by court order from living in the residence of the children and restrained from visiting except as outlined in the restraining order. On December 30, 1996, the case was "staffed" by the Department.

In January of 1997 the court appointed attorneys for Mother and Father and a guardian ad litem for the children.[4]

In May 1997 an Order of Adjudication and Disposition was entered which found all five children to be dependent and neglected due to special needs and the inability of the parents to properly care for their special needs. The court ordered intensive home intervention. Due to the apparent failure of the Department to provide services as ordered by the court, the guardian ad litem filed a motion in June 1997 to compel the Department to provide services such as summer programs and daycare for the children. The court required a mental examination of Mother. On July 15, 1997, a psychological evaluation was performed on Mother which indicated that her mental capacity was limited.[5] Several agencies provided services to or for the family in 1997 and 1998 but the mental health services, which Mother obviously required, were not provided.

In April of 1998, Father was sentenced to six years for attempted aggravated sexual battery.

In December of 1999, the Board of Education filed a Petition for Educational Neglect and Truancy regarding M.E. (Madison) and M.E. (Morgan).[6] In January and February of 2000 the children complained to school authorities and others of sexual abuse by the landlord and by Mother's boyfriend. In March of 2000, another petition was filed by the Board of Education alleging educational neglect and truancy, adding the other three children this time. Allegations of ongoing sexual abuse and truancy persisted.

In March of 2000 the court appointed a different attorney to represent Mother and appointed a different guardian ad litem for the children.[7]

In May 2000 the Department filed an Expedited Long Term Petition to Adjudicate Dependency and Neglect and for Court Ordered Services due to reports of sexual abuse, lack of medical care and Mother's failure to set limits. The petition sought to declare all five children dependent and neglected. Following a hearing, all five children were placed in custody of the

---

[4]Neil Flit was appointed to represent Mother. J. M. O'Neil was appointed to represent Father. Sherry Goodwin was appointed as guardian ad litem for the children.

[5]The 1997 psychological evaluation report is not in the record; however, the Agreed Order of Adjudication states, "Psychological reports performed on [Mother] in 1997 and 2001 indicate that [Mother] is mentally limited."

[6]The initials are those of the children. The names are fictitious and have been assigned to distinguish the children because the initials are the same for both of them, and the facts require that the children be distinguished.

[7]Thomas Miller was appointed to represent Mother and Isabelle Maumus was appointed guardian ad litem for the children.

Department. Four of the children were placed in foster homes and Morgan, who needed a higher level of care, was placed at Dede Wallace Emergency Shelter. The juvenile court ordered another psychological evaluation of Mother.

On May 12, 2000, Mother had an initial intake psychological evaluation at Dede Wallace. A psychological report by Barry Boggs, Ph.D. of ABC Sciences, dated March 22, 2001, was provided to the Department and the juvenile court. The report reveals numerous deficiencies. Mother tested as being "submissive, dependent, and deficient in competent assertiveness." It also revealed that her "[f]ears of losing emotional support often lead her to be overly compliant and obliging" and that "[s]he is quite naive about worldly matters. . . . Her thinking is often unreflective and scattered." The report further indicated, "When faced with interpersonal tensions, she attempts to deny her disturbing thoughts or acknowledge inner tensions." In his Test Results and Interpretations of her personality, Dr. Boggs found her cognitive function on a Verbal Scale IQ to be 64 (in the 1st percentile) with her overall performance classified in the "Extremely Low" range and ranked at the 2nd percentile. He opined that she may have a language deficit and that her relative weaknesses are "in her understanding of the meaning of individual words, verbal conceptualization, and understanding of social conventions and customs in the abstract." His summary included findings that she "will have extreme difficulty understanding and processing information that is solely verbal in nature, and would benefit from the use of visual aids or modeling whenever possible." Dr. Boggs' recommendations included that she have "individual psychotherapy with a therapist who is effective in treating the dependent personality and its associated problems (e.g., depression, anxiety, fears of abandonment, etc.). Intense home-based services will be required for [Mother] and her children until [Mother] comes to gain a sense of effective independence."

In October 2000 the guardian ad litem was allowed to withdraw and a substitute was appointed by the court.[8] Morgan remained in a group home, was diagnosed as being in the mild range of mental retardation, and received counseling.

Dr. Boggs' report was provided to the Department and the juvenile court on March 22, 2001; however, the services recommended by Dr. Boggs were never provided.

In June 2001 new permanency plans were filed by the Department for all five children. The goal was changed to adoption.[9]

The trial was held over a period of six months on seven non-consecutive days, July 10, July 17, July 29, November 5, December 9, December 11 and December 12, 2002. On February 26, 2003, seven months after the trial began and some two and one-half months after the final day of trial, the juvenile court entered an order terminating Father's parental rights to his three children,

---

[8] Sherry Goodwin was re-appointed guardian ad litem.

[9] The goals of previous Permanency Plans had been "return to parent."

R.B., M.B. and S.B.[10] On March 11, 2003, the juvenile court entered an order terminating Mother's parental rights to her three youngest children, R.B., M.B., and S.B. Mother's parental rights to Madison and Morgan were not terminated. While the juvenile court found grounds to terminate Mother's parental rights to all of her children, including Madison and Morgan, it found that termination was not in the best interest of Madison and Morgan.[11]

<u>Standards for Reviewing Termination Cases</u>

A biological parent's right to the care and custody of his or her child is protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 2060 (2000); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn.1993); *Ray v. Ray*, 83 S.W.3d 726, 731 (Tenn. Ct. App. 2001). While this right is fundamental and superior to the claims of other persons and the government, it is not absolute. It continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination. *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002); *Stokes v. Arnold*, 27 S.W.3d 516, 520 (Tenn. Ct. App. 2000); *O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn. Ct. App. 1995).

Termination proceedings in Tennessee are governed by statute. Parties seeking to terminate parental rights must prove two things. First, they must prove the existence of at least one of the statutory grounds for termination. Tenn. Code Ann. § 36-1- 113(c)(1); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). Second, they must prove that terminating the parent's parental rights is in the child's best interests. Tenn. Code Ann. § 36-1-113(c)(2); *In re A.W.*, 114 S.W.3d 541, 544 (Tenn. Ct. App. 2003); *In re C.W.W.*, 37 S.W.3d 467, 475-76 (Tenn. Ct. App. 2000).

To terminate a parent's parental rights Tenn. Code Ann. § 36-1-113(c) requires proving all the elements by clear and convincing evidence. This heightened burden of proof minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying this standard eliminates serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *In re C.D.B.*, 37 S.W.3d 925, 927 (Tenn. Ct. App. 2000). It produces a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d at 733; *In re C.W.W.*, 37 S.W.3d at 474.

---

[10]That order was amended on March 7, 2003, to correct a typographical error.

[11]The Department does not appeal the court's ruling that termination of Mother's parental rights was not in the best interests of Madison and Morgan.

Proceedings to terminate parental rights require individualized decision-making. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999). Tenn. Code Ann. § 36-1-113(k) requires courts terminating parental rights to enter an order which makes specific findings of fact and conclusions of law. *In re Adoption of Muir*, No. M2002-02963-COA-R3-CV, 2003 WL 22794524, at *3 (Tenn. Ct. App. Nov. 25, 2003).

> Because of the heightened burden of proof required by Tenn. Code Ann. § 36-1-113(c), we must adapt Tenn. R. App. P. 13(d)'s customary standard of review for cases of this sort. First, we must review the trial court's specific findings of fact de novo in accordance with Tenn. R. App. P. 13(d). Thus, each of the trial court's specific factual findings will be presumed to be correct unless the evidence preponderates otherwise. Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights. *Jones v. Garrett*, 92 S.W.3d at 838; *In re Valentine*, 79 S.W.3d at 548-49; *In re Adoption of Muir*, 2003 WL 22794524, at *2; *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *9-10 (Tenn. Ct. App. June 3, 2003) (No Tenn. R. App. P. 11 application filed); *Ray v. Ray*, 83 S.W.3d at 733; *In re L.S.W.*, No. M2000-01935-COA-R3-JV, 2001 WL 1013079, at *5 (Tenn. Ct. App. Sept. 6, 2001), *perm. app. denied* (Tenn. Dec. 27, 2001).[12]

*In re M.J.B.*, ___ S.W.3d ___, ___, 2004 WL 769252, at *8 (Tenn. Ct. App. 2004).

<u>The Record</u>

The record in this case is abysmal. Documents are included that have no bearing on the issues.[13] Documents that are of the utmost importance to the issues presented are missing.[14] The inclusion of extraneous, irrelevant documents reflects poorly on those responsible for such but it

---

[12] *In re C.M.M*. notes that these decisions distinguish between specific facts and the combined weight of these facts. Tenn. R. App. P. 13(d) requires an appellate court to defer to the trial court's specific findings of fact as long as those findings of fact are supported by a preponderance of the evidence. We must then determine if the combined weight of these facts provides clear and convincing evidence supporting the trial court's ultimate factual conclusion. In *In re Valentine*, the Tennessee Supreme Court recognized the difference between the conclusion that a biological parent had not substantially complied with her obligations in a permanency plan and the facts upon which the trial court relied to support this conclusion. *In re C.M.M*, 2004 WL 438326, at *5 (Tenn. Ct. App. March 9, 2004) (citing *In re Valentine*, 79 S.W.3d at 548-49).

[13] For example, the file contains an enormous quantity of irrelevant documents including motions and fee requests with detailed time sheets and orders granting fees of attorneys whose services are not at issue and which documents have absolutely no bearing on the issues on appeal.

[14] The most important of which are orders pertaining to the juvenile court finding Father indigent and entitled to appointed counsel, the appointment of that counsel, the hearing pertaining to the motion to withdraw by that counsel, particularly the basis for withdrawal, evidence to support the motion and any affidavits or transcripts of the evidence pertaining to such issues.

does not preclude this court from performing its duty to review an appeal. It does however make it substantially more burdensome. Omitting important, relevant documents, however, is a much more serious matter. Such omissions may preclude this court from reviewing relevant aspects of the case, which may affect the merits of the appeal and the rights of the parties including, as in this case, the rights of innocent children.

This court has addressed these deficiencies before and it is most unfortunate that we must do so again and in a case of such importance to the parties and the children whose lives hang in the balance.

Such errors and omissions are not uncommon in appeals from juvenile courts. "Like many other appeals from decisions to terminate parental rights under Tenn. Code Ann. § 36-1-113, the record in this case contains many extraneous documents that are not properly includable on appeal." *In re M.J.B.*, 2004 WL 769252, at *5-6. In *M.J.B.* this court observed that "this is apparently due to the notions, particularly entertained by juvenile court clerks, that a termination case is simply a continuation of a dependent-neglect case." *Id.* at *5. The confusion may be due to the mistaken belief that the process for appealing to this court from a final judgment in a termination proceeding is the same as the process used to perfect a *de novo* appeal to the circuit court in a dependent-neglect case. Such is simply not the case.

The primary purpose of a dependent-neglect proceeding is to provide for the care and protection of children whose parents are unable or unwilling to care for them. The sole purpose of the termination proceeding under Tenn. Code Ann. § 36-1-113 is to sever irrevocably the legal relationship between biological parents and their children. Moreover, a "termination of parental rights proceeding is not simply a continuation of a dependent-neglect proceeding. It is a new and separate proceeding involving different goals and remedies, different evidentiary standards, and different avenues for appeal." *In re M.J.B.*, 2004 WL 769252, at *5.

Dependent-neglect proceedings, as distinguished from termination proceedings, are intended to be procedurally informal and juvenile courts may receive and rely on all evidence helpful in determining the questions presented, including oral and written reports, even though not otherwise competent in the hearing on the petition. Tenn. Code Ann. § 37-1-129(d). Informality is not appropriate in termination proceedings. Tenn. Code Ann. § 37-1-124(a). The rules of evidence in a termination proceeding are much stricter. The Tennessee Rules of Evidence and the evidentiary rules in the Tennessee Rules of Juvenile Procedure apply in termination proceedings. Tenn. Code Ann. § 36-1-113(j). Unlike in dependent-neglect proceedings, the court hearing a termination case may only consider evidence that has been "formally admitted." Tenn. R. Juv. P. 28(c). There are other important differences that affect the record on appeal.

> Final orders in dependent-neglect cases are immediately appealable; however, the appellate remedies available in these cases differ from appellate remedies in other civil cases. In dependent-neglect cases, the parties dissatisfied with a juvenile court's final decision must appeal to the circuit court. Rather than relying on the juvenile

court's record, the circuit court must try the case de novo by hearing all the witnesses again and by rendering an independent decision based on the evidence received in the circuit court proceeding. Tenn. Code Ann. § 37-1-159(a). On the other hand, appeals in termination cases are appealed directly to this court and are governed by the Tennessee Rules of Appellate Procedure. Tenn. Code Ann. §§ 36-1-113(q), 122(b)(1), 124(b) (2001).

In appeals from a juvenile court's final dependent-neglect order, Tenn. Code Ann. § 37-1-159(c) requires the juvenile court to forward to the circuit court "the entire record in the case, including the juvenile court's findings and written reports from probation officers, professional court employees or professional consultants." No such provision exists with regard to appeals from final orders in termination cases. Accordingly, the appellate record in an appeal from a final termination order should consist only of (1) the petition to terminate parental rights and all pleadings and other papers subsequently filed with the lower court, (2) a transcript or statement of the evidence of the termination proceedings in the lower court, (3) the original of all exhibits filed in the lower court in the termination proceeding, and (4) any other matter designated by a party and properly includable in the record on appeal. Tenn. R.App. P. 24(a).

These generally applicable limitations in the content of the record on appeal are reflected and amplified in the Tennessee Supreme Court's proposed amendments to the Tennessee Rules of Appellate Procedure designed to expedite appeals in termination of parental rights cases. *See In re Amendments to the Tennessee Rules of Appellate Procedure* (Tenn. Jan. 15, 2004)(citation omitted). When it takes effect on July 1, 2004, proposed Tenn. R.App. P. 8A(c) states unequivocally that "[i]n addition to the papers excluded from the record pursuant to Rule 24(a), any portion of a juvenile court file or a child dependency, delinquency or status case that has not been properly admitted into evidence at the termination of parental rights trial shall be excluded from the record."

* * * *

When a record on appeal contains extraneous materials, it becomes difficult to ascertain whether and to what extent the trial court relied on these materials. It also creates a risk that these materials might influence the appellate court's consideration of the case. Separating the evidentiary wheat from the chaff is extremely difficult and time consuming, and impedes the court's efforts to expedite these appeals in accordance with Tenn. Code Ann. § 36-1- 124(b). In the future, the contents of the record on appeal in all cases involving the termination of parental rights must comply with this opinion and with proposed Tenn. R.App. P. 8A(c).

*In re M.J.B.*, 2004 WL 769252, at *6.

In addition to the foregoing, the Tennessee Rules of Appellate Procedure identify the contents of an appellate record. The rules further instruct the parties and the Clerk concerning their respective duties to assure that the record on appeal contains the information and documentation needed to present the factual and legal issues to this court. Tenn. R. App. P. 24(a) identifies the papers filed in the juvenile court that will be presumptively part of the record on appeal and instructs the parties on how to supplement or abridge the record.

The omissions from this record are substantial, they are inexcusable and reflect poorly – and for some unfairly – on the juvenile court, the juvenile court clerk and counsel. More important, such errors may adversely effect the rights and welfare of the children who are the subject of this litigation, the rights of their parents and the rights of the Department, which has a duty to protect the children. It is further unfortunate that we find it necessary to repeatedly reference the inadequacy of this record throughout this opinion and specifically in the discussion of Father's issues.

<u>Mother's Case</u>

Mother's deficiencies as a parent are most apparent. The record is replete with instances where she failed to protect her children, and there is a long history of neglect, lack of adequate parental supervision, medical neglect and failure to meet educational and social needs. Nevertheless, termination proceedings based on the grounds in Tenn. Code Ann. § 36-1-113(g)(3) require the Department to demonstrate that it has made reasonable efforts to reunite a child with his or her parent. Establishing that it has made reasonable efforts to reunite the child with his or her parents is an essential part of the Department's case, which the Department must prove by clear and convincing evidence. *In re C.M.M.,* No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *8 (Tenn. Ct. App. March 9, 2004).

The record shows that the Department provided numerous services to Mother and the family, either directly or through agencies including Home Ties, YWCA, Dede Wallace, Staying Home and Coming Home, Caring For Children Program, and the Rape and Sexual Abuse Center. However, the record reveals that the Department failed to provide the most obvious and essential service Mother needed, the mental health services recommended by Dr. Boggs. The juvenile court recognized early on that Mother had mental deficiencies. Indeed, the juvenile court twice ordered psychological evaluations for Mother. On June 25, 1997, the court ordered the Department to provide a psychiatric evaluation for Mother. The first evaluation was performed on July 15, 1997, but the report is not in the record. Then on May 3, 2000, the court again ordered that a mental evaluation be performed on Mother with the "referral to be made by DCS and CSA."[15] Mother had an initial intake psychological evaluation with Dr. Osborne at Dede Wallace on May 12, 2000. The psychological evaluation however was not performed for almost a year. It was performed by Barry Boggs, Ph.D. His report dated March 22, 2001, is in the record.

---

[15] The hearing occurred on May 3, 2000, but the order was not filed until June 23, 2000.

Many important findings are set forth in the report by Dr. Boggs but two leap from the pages. One, Mother has "extreme difficulty understanding and processing information that is solely verbal in nature." Two, "It is recommended that [Mother] seek individual psychotherapy with a therapist who is effective in treating the dependent personality and its associated problems, (e.g., depression, anxiety, fears of abandonment, etc.)."

It is troubling to note that the juvenile court ordered the Department to make the referral for Mother to have a second psychological evaluation, and the evaluation recommended individualized therapy, yet the therapy was not provided. Though the Department provided many services that would likely meet the criterion of reasonable services in some cases, by failing to provide the recommended psychological therapy, the services that were provided proved to be a waste of time and money. Even more troubling is the fact that two months after the psychological evaluation by Dr. Boggs, the Department proceeded to amend the permanency plans changing the goal to adoption from the previous goal of returning the children to the parent.[16] Why the Department failed to act upon the report and recommendations by Dr. Boggs is not apparent. Unfortunately, that failure is not the Department's only deficiency in this case.

Though the reasons for the Department's failures are not critical to our determination, they are indicative of the overall inadequacies of the Department's efforts. Perhaps some of the Department's deficiencies result from the length of time the cases drug along. The first intervention occurred in 1994, yet the first filing to declare the children dependent and neglected did not occur until 1996. The children were first removed from Mother in June 2000, yet the petition to terminate the parental rights was not filed until two years later in June 2002. The trial did not begin until July, 2002, eight years following the first intervention by the Department. Moreover, and while it may not be the Department's fault that the case was tried over a period of six months, this additional delay served to exacerbate the earlier delays.

One may also infer that the deficiencies in the Department's performance pertained to changes in key personnel. The first case manager, Shawn Scruggs, was clearly supportive of Mother. Her reports indicated that the children were happy to see their mother, that their mother asked questions of the case manager, and that the mother appeared concerned about the children's well-being. Conversely, the second case manager, Doris Dodd, had a very different attitude. She reported that Mother had no parenting skills and that the girls maneuvered their mother into doing what they wanted. More importantly, the differences in the Department's efforts during Ms. Scruggs' tenure and Ms. Dodd's tenure are dramatic. A close review of the record reveals a serious deficiency in Ms. Dodd's performance. For example, one of the first things a case manager, who takes responsibility for a case that has been open for a while, would do would be to review the file to ascertain what has been accomplished and what needs to be done. That was not done in this case. The following is an illuminating portion of the testimony of Ms. Dodd who was questioned by Mother's attorney concerning the Department's reasonable efforts, or the lack thereof, to assist Mother in fulfilling her responsibilities under the permanency plans:

---

[16]The psychological report was dated March 22, 2001, and the permanency plans were filed June 4, 2001.

A.    Homes services was provided, the Exchange Club, DCS Homemaker, and Home Ties.

Q.    And what was the time period of their intervention?

A.    The Exchange Club began April the 25th of 2000. That was before they were already set up.

Q.    Was that before the children came into custody?

A.    (No audible response.)

Q.    Wasn't that before the children came into custody?

A.    Yes, sir.

Q.    I was talking about after they came into custody.

A.    We tried the services prior, but she didn't cooperate.

Q.    I'm looking for some parenting or in-home services that were provided after the children came into foster care. Can you tell me what they were?

A.    Went to parenting classes.

Q.    Did she complete them?

A.    Yes, sir.

Q.    Any other in-home services?

A.    She didn't stay in the area long enough for us to put any in-home services

Q.    How do you know that?
      . . . .

A.    I set up with Home Ties where she was living in 11-7-2000.

Q.    Okay. Now, you didn't set that up, did you, because you didn't have the case?

A.    No. That was prior.

Q.    So you have documentation that they tried to intervene and were not able to because she was moving?

A.    Yes, sir.

Q.    After she moved, did you try again?

A.    I don't remember.

Q.    Do you have any documentation that you tried again?

A.    I don't know.
      . . . .

Q.    Did she tell you why she was moving so much?

A.    No, sir.

Q.    Did you ask?

A.    One time she told me she – yes, I did ask. One time she did tell me her and her boyfriend had broke up. That's all I know.

Q.    Did you ask her anymore?

A.    I don't remember why I didn't ask.
      . . . .

Q.    It seems to me if you were the case manager in charge of implementing a plan. . . where. . . the only goal was returning five children to the mother, you'd want to know why . . . she was moving around so much. That looks like something you'd have asked and remembered, but you just don't?

-11-

A.      No, sir; I don't.
Q.      [W]ouldn't there have been things the Department could have done to assist her?
A.      Yes.
         . . . .
Q.      Ms. Dodd, my question is you didn't even try, did you?
A.      With housing?
Q.      Yes.
A.      No.

Though the task may be difficult and frustrating, the Department has an affirmative duty to make reasonable efforts to preserve, repair and/or restore parent-child relationships wherever reasonably possible.

        Unless permitting a child to remain with his or her parents will expose the child to a substantial risk of harm, the Department must make "reasonable efforts" to "prevent the need for removal of the child from such child's family" before it separates a child from his or her parents. Tenn. Code Ann. § 37-1-166(a)(1).  Once the Department separates a child from his or her parents, its first priority must be to restore the family unit if at all possible. (Citations omitted).  Thus, the Department must make "reasonable efforts" to make it "possible for the child to return safely to the child's home."  Tenn. Code Ann. §§ 37-1-166(a)(2)-166(g)(2).  The Department may even delay termination proceedings if it decides it has not had sufficient opportunity to make "reasonable efforts" to provide the services needed to enable the child to return home safely.  Tenn. Code Ann. § 36-1-113(h)(2)(C).  Finally, in cases where reasonable remedial efforts are required, the Department may support its claim that terminating a parent's parental rights is in a child's best interest by introducing evidence that the parent "has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible." Tenn. Code Ann. § 36-1-113(I)(2).
        . . . .

        The Department's statutory obligation to make "reasonable efforts" to preserve, repair, or restore parent-child relationships need not be "Herculean." (Footnote omitted).  The General Assembly has defined "reasonable efforts" as "the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1).  The reasonableness of the Department's efforts must be decided on a case-by-case basis.  Determining whether the Department's efforts have been reasonable requires the courts to consider, among other factors: (1) the reasons for separating the parent from his or her child or children, (2) the parent's physical and mental abilities, (3) the resources available to the parent, (4) the parent's efforts to remedy the conditions that required the separation, (5) the resources available to the Department, (6) the duration of the parent's remedial efforts, and (7) the closeness of

-12-

the fit between the conditions that led to the initial separation, the requirements in the permanency plan, and the Department's efforts.

*In re C.M.M.,* 2004 WL 438326, at *6-7.

While the Department's efforts need not be Herculean, efforts directed toward matters of little consequence are not reasonable. *See In re Valentine*, 79 S.W.3d at 547-48. Moreover, the Department's employees "must use their superior insight and training to assist parents with the problems the Department has identified in the permanency plan, whether the parents ask for assistance or not." *In re C.M.M.*, 2004 WL 438326, at *7; see also *In the Matter of D.D.V.*, No M2001-002282-COA-R3-JV, 2002 WL 225891, at *8 (Tenn. Ct. App. Feb. 14, 2002). Here, the record shows that the Department provided numerous services; however, those services were of little consequence due to the Department's failure to provide the most critical, indeed the most obvious service required by Mother, psychological counseling.

The Department's failure to provide services of more than "little consequence" is aggravated by the fact that without the benefit of the effective assistance – reasonable efforts – of the Department, Mother made numerous efforts to comply with the permanency plans, which efforts produced some successes, at least temporary successes. For example, she obtained housing, worked on a budget with her aunt's assistance, had a full-time job for a period of two years, completed non-offender abuse counseling and continued to visit her children.

Admittedly, the remedial responsibility does not rest entirely on the Department for a parent must make reasonable efforts to remedy the conditions that required the separation. *In re R.C.V.*, No. W2001-02102-COA-R3-JV, 2002 WL 31730899, at *12 (Tenn. Ct. App. Nov. 18, 2002). However, the success of a parent's efforts is often intertwined with the efforts of the Department. *State Dep't of Children's Servs. v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *10 (Tenn. Ct. App. Aug. 13, 2003). Thus, the importance of the Department providing services designed to meet the needs of the family – this family – Mother and R.B., M.B. and S.B.

Meeting the needs of the family is one of the reasons the reasonableness of the Department's efforts must be decided on a case-by-case basis. While the Department provided numerous services, the failure to provide the individualized psychological services, the need for which were most evident from Dr. Boggs' report, mitigates the beneficial value of the other services provided by the Department and its service providers.[17]

---

[17]We recognize that the Department has overwhelming responsibilities, and that the majority of its staff and support agencies is capable and dedicated. We also recognize that the juvenile courts of Tennessee have overwhelming dockets and demands to aid children and their families in what appear to be nearly impossible situations. Nevertheless, there is no justification for the Department failing to coordinate its responsibilities to these children. Going through the motions by providing services that are usually appropriate for families in distress is no substitute for providing services that are mandated by the facts of the case.

Once the Department separated the children from Mother, its first priority was to restore the family unit if at all possible. *In re C.M.M.,* 2004 WL 438326, at *6. The Department had the affirmative duty to make reasonable efforts to make it possible for the child to return safely to the child's home. Tenn. Code Ann. §§ 37-1-166(a)(2)–(g)(2). The General Assembly defines reasonable efforts as the exercise of reasonable care and diligence by the department to provide services related to "meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). It is apparent from this record that the efforts of the Department were grossly inadequate for they did not meet the needs of Mother, R.B., M.B. and S.B. Accordingly, we vacate the order terminating Mother's parental rights and remand this issue to the juvenile court for further proceedings.

## Father's Case

Father raises two related issues: whether the trial court erred by requiring Father to go forward with the trial without the aid of counsel, thereby denying him his constitutional and statutory right to counsel, and whether he was denied the effective assistance of counsel because his attorney failed to appear in court on three of seven trial days.

At the inception of the termination action, the trial court determined that Father was indigent and entitled to be represented by counsel and thus appointed counsel to represent him in the termination proceedings.[18] Entitlement to appointed counsel in a parental termination action is controlled by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Tennessee Constitution and Rule 39 of the Tennessee Rules of Juvenile Procedure. Rule 39 of the Tennessee Rules of Juvenile Procedure provides:

> (1) The court shall conduct an adjudicatory hearing to determine the issues raised by the petition and by any answer(s) filed. Notice of the hearing shall be provided in the summons.

> (2) At the beginning of the hearing, any party who appears without an attorney shall be informed of the right to an attorney, and in the case of an indigent respondent, the court shall consider the facts and circumstances alleged and make a determination as to whether an attorney should be appointed.

Tenn. R. Juv. P. 39(f)(1)-(2). The procedures of Rule 39(f)(2) concerning the right to have an attorney, appointed or otherwise, are mandatory. *State, Dept. of Human Services v. Taylor*, No. 03A01-9609-JV-00286, 1997 WL 122242 (Tenn. Ct. App. March 19, 1997).

---

[18]There is no order concerning the appointment or the basis for the appointment of counsel for Father; however, the record contains the Department's form entitled "Family Services Decree Note" from a hearing held on January 8, 1997, that clearly indicates that Father was declared indigent and that attorney J. M. O'Neil was appointed to represent him. Mother was also declared indigent and attorney Neil Flit was appointed to represent her. Sherry Goodwin was appointed guardian ad litem for the children. (See page 12, Vol. I.) .

Our present Rules of Juvenile Procedure became effective July 1, 1984. Since these rules postdate *Lassiter*, it would appear that in order to insure that the conditions therein stated are properly considered, the Tennessee Supreme Court and the General Assembly, by the adoption of the Rules of Juvenile Procedure, provided *minimum requirements* which the trial court must follow when a parent appears at a termination hearing without an attorney.

. . . .

Since it is well-settled that a parent has a fundamental right, (constitutionally guaranteed against the state when no substantial harm threatens a child's welfare), to the care, custody and control of their children, *we consider the procedures of Rule 39(f)(2), regarding the right to have an attorney, appointed or otherwise, to be mandatory*.

*Taylor*, 1997 WL 122242, at *2 (emphasis added).

The U.S. Supreme Court considered whether the Due Process Clause required the appointment of counsel for an indigent parent facing termination of his or her parental rights in *Lassiter v. Department of Social Services*, 452 U.S. 18, 101 S. Ct. 2153, 68 L. Ed.2d 640 (1981), mentioned above. Applying a "fundamental fairness test," the Supreme Court reasoned that in each case three elements must be evaluated to determine the answer: (1) the private interests at stake, (2) the government's interest, and (3) the risk that the procedures will lead to erroneous decisions. *Lassiter*, 452 U.S. 18, 27, 101 S. Ct. 2153, 2159, 68 L. Ed. 2d 640, 649 (citing *Matthews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 903, 47 L. Ed. 2d 18, 33 (1976)). Fourteen years later, this court held that one of the main considerations in determining whether counsel must be appointed is the chance that the failure to appoint counsel will result in an erroneous decision. See *State ex rel. T.H. by H.H. v. Min*, 802 S.W.2d 625, 626-27 (Tenn. Ct. App. 1990). Thus, a parent facing a termination proceeding may be entitled to the assistance of appointed counsel as a matter of due process whenever the court determines that a substantial risk of an erroneous decision exists.

Here, the juvenile court made the determination at the commencement of the termination proceedings that Father was indigent and appointed counsel to represent Father. Having done so, we believe the right to counsel presumptively continues until the trial court makes an express finding that the indigent parent is no longer entitled to counsel. There is no such order in the record. Moreover, there is nothing in the record to indicate that the juvenile court made a finding that Father is no longer indigent or no longer entitled to be represented by appointed counsel. Furthermore, there is no evidence in the record that Father's financial situation improved to the extent he was no longer indigent. To the contrary, the record suggests his financial condition worsened during the pendency of these proceedings due to the fact that Father was incarcerated for approximately two years subsequent to being declared indigent and prior to the trial.[19] His incarceration obviously did not improve his financial situation. Accordingly, there is no basis for us to conclude that Father was

---

[19]He was incarcerated on October 14, 1997, for violating the conditions of his bond (consuming alcohol). He was subsequently sentenced to six years at 30%, which sentence was served during these proceedings.

no longer indigent when the matter was tried. Moreover, there was a subsequent determination of Father's indigency and entitlement to appointed counsel in this matter. Following the conclusion of the trial and after this appeal was filed, Father's indigency was put at issue by the Department. As a consequence, this court conducted a review of the record and we noted that Father was without counsel on appeal though he had been declared indigent by the juvenile court. Since Father claimed he was indigent and the Department challenged his indigency, we remanded the issue to the juvenile court to determine whether Father was indigent and entitled to appointed counsel on appeal.[20] The juvenile court conducted a hearing on October 21, 2003 and again determined that Father was indigent and an attorney was appointed on his behalf for purposes of appeal.

From the foregoing, we know that the juvenile court determined that Father was indigent and entitled to appointed counsel both at the inception of the termination proceedings and following the conclusion of the trial when his indigency was at issue on appeal. We also know that there is no evidence in the record to suggest that Father's financial situation improved during these proceedings. To the contrary, the evidence suggests that Father's financial situation likely deteriorated because he was incarcerated for a substantial period during these proceedings. From all of this we must conclude that Father was indigent and had the right to appointed counsel throughout the proceedings in juvenile court.

One who is entitled to be represented by appointed counsel can waive that right. Failure to cooperate with appointed counsel can constitute a waiver of the right to appointed counsel. *Dept. of Children's Svcs. v. Agbigor*, No. M2000-03214-COA-R3-JV, 2002 WL 31528509, at *6 (Tenn. Ct. App. Nov. 15, 2002). Thus, we must determine whether Father's conduct constituted such a waiver.

Though the record is grossly inadequate and provides more questions than facts, we know that Father's second attorney, Stephen Mills, filed a motion in June 2001 to withdraw on the grounds of failing to communicate. We also know that the motion was based on the mere conclusory statement of counsel because there is no affidavit in support of the motion. There is no transcript of the hearing on the motion; therefore, there is no other evidence in the record to establish that

---

[20]This court's order remanding the indigency issue to the juvenile court on October 7, 2003 stated:

The juvenile court determined that L.B. was indigent when it originally appointed a lawyer to represent him. There is no indication in the record that the juvenile court subsequently changed its mind about L.B.'s indigency, and we cannot conclude that L.B.'s decision to hire a lawyer after his appointed lawyer withdrew necessarily means that L.B. is not entitled to an appointed lawyer to represent him on appeal. Nevertheless, in light of the Department's challenge to L.B.'s indigency and the lack of specific findings in the record, a prompt determination must be made as to whether L.B. is a person "who does not possess compensation for the services of a competent attorney." (citation omitted). Because this court is not a fact-finding court, the case must be remanded to the juvenile court for a determination of indigency.

Father failed to communicate with appointed counsel.[21]  Moreover, there is no order in the record granting the motion and no written findings by the court.[22]  The unsubstantiated motion seeking leave to withdraw is insufficient for us to conclude that Father is no longer entitled to be represented by appointed counsel.  To further confuse matters, there is no order that pertains to the issues raised in the motion but there is an order permitting the voluntary substitution of counsel wherein attorney Stuart Fields is substituted for Steve Mills.  Of course, the order provides no findings concerning whether Father was or was not still indigent or was or was not still entitled to be represented by appointed counsel.

While the juvenile court made no findings concerning Father's cooperation and the record before us is of course incomplete, there is enough in the record for us to decipher Father's actions to compare them to those of Mr. Agbigor.  Such a comparison is relevant for Mr. Agbigor was found to have waived his right to counsel for failing to communicate with his appointed attorney.  The opinion reveals that

> Mr. Agbigor voluntarily chose a month long visit to Nigeria and returned only two weeks before the trial was to begin. He still did not contact his attorney in order to prepare for the hearing and did not appear in the court at the time the termination hearing was scheduled. . . .  Further, upon belated arrival at the termination hearing on July 24, 2000, when confronted by the court with the basis for Mr. Miller's application to withdraw as his counsel, he uttered not one word in denial of Mr. Miller's representations to the court and offered no contradiction of the assertion that he had failed to contact his attorney for a number of months. Therefore, Mr. Agbigor effectively waived his right to the continued representation of the attorney who had served him for nearly three years prior to the termination hearing in a manner apparently satisfactory to Mr. Agbigor.

*Agbigor*, 2002 WL 31528509, at *5.  The opinion further reveals that Mr. Agbigor's attorney had diligently represented him for nearly three years before the final termination proceeding, that his attorney represented to the trial court in his motion to withdraw and in his statement in open court

---

[21]The record reveals that Father did not attend court proceedings for well over a year while he was incarcerated. This was due to the fact that Father was incarcerated for violating the terms of his bond in a criminal case while this matter was pending.  Father's attorney had attended court proceedings with Father until Father's incarceration; however, his attorney did not attend court proceedings after Father was incarcerated.  Father's incarceration, without other aggravating factors, would not be a proper basis for the attorney to cease representing him or for the juvenile court to conclude that Father was no longer entitled to be represented by counsel.  To the contrary, Father's need for counsel was greater after his incarceration for he was unable to attend court proceedings to represent himself.

[22]The only order in the record that pertains to the appointment of counsel, withdrawal of counsel or substitution of counsel of Father's attorneys is the order substituting Stuart Fields for Father's second attorney, Steve Mills.  There is no order appointing O'Neil or substituting Mills for O'Neil.  And there is no order addressing the grounds stated in Mills' motion to withdraw.  Moreover, there is nothing in the record to indicate why Father's counsel were granted leave to withdraw or were substituted.

shortly after 8:30 a.m. on the day of trial, that Mr. Agbigor had not contacted him in several months and that he had been unable to contact Mr. Agbigor.

Contrary to the acts and omissions of Mr. Agbigor, our record shows that Father attended court proceedings until his incarceration on October 14, 1997, and it shows that Father attended the court proceedings after his release. It also shows that he not only attended numerous court hearings but that he was cooperative with the court and proactive in his own representation. The most compelling example of his participation is his attendance throughout the trial and his efforts to represent himself in the absence of his attorney during most of the trial. Such active participation and cooperation is contrary to the typical actions of a party who fails to communicate with counsel and/or acts in a manner that would justify a waiver of one's right to appointed counsel. We therefore conclude that Father's actions do not constitute a waiver of his right to appointed counsel. Accordingly, Father was still entitled to be represented by appointed counsel during all relevant times including the trial.

Such a determination combined with the juvenile court's error of failing to appoint substitute counsel to represent an indigent litigant would typically conclude our analysis of whether the litigant was deprived of the right to counsel. However, Father retained or attempted to retain private counsel to represent him. Therefore, we must determine whether this renders the error harmless.

On the eve of trial, Father retained, or attempted to retain Stuart Fields to represent him. Fields' participation at trial, or lack thereof is shocking. He did not appear for the commencement of the first day of the hearing, July 10, 2002, on the petition to terminate. The court called Mr. Fields' office only to find that his phone had been disconnected. For reasons not in the record the juvenile court judge elected to begin the trial without Father having an attorney present. Mr. Fields appeared later in the morning and questioned witnesses. The court took a break for lunch, but when court resumed Mr. Fields was again absent yet the juvenile court again elected to proceed without Father having an attorney. Following questioning of one of the witnesses, the court stated to Mother's attorney, "you just finished your examination. It would be Mr. Fields' turn. He's not here." Having no attorney to represent him, Father endeavored to cross-examine some of the witnesses. Mr. Fields appeared later in the day and questioned some witnesses that afternoon.[23] Mr. Fields was present and participated on the second and third day of trial, July 17 and July 29, 2002. The fourth day of hearing, November 11, 2002, was scheduled to begin at 8:30 a.m., but Mr. Fields did not appear and did not call. The juvenile court again elected to proceed with the trial even though Father had no attorney present to represent him and there is no indication that Mr. Fields appeared at all that day. The fifth day of hearing was on December 9, 2002. The court asked Father if his attorney was coming. Father replied that he had not spoken with Mr. Fields since the last hearing. The court stated that it had waited on Mr. Fields probably a total of two or three hours during the course of the trial and was going to proceed even though Father had no attorney present.

---

[23]The record reveals that Father started questioning the witness on page 143 of the transcript of the evidence and continued to do so through page 151, see volume IX. Father's attorney, Stuart Fields appeared at some point and began questioning a witness at page 154 of the transcript of the evidence, see volume X.

The court stated, "[I]f at any point during the hearing there is a question that you believe needs to be asked, you may raise your hand and I will recognized you at the proper time and let you ask a question." At end of this hearing, the court instructed Father, "Now, your choices are to get Mr. Fields to be here to handle your case. I'm assuming that you're paying him to represent you. He needs to be here with you particularly for that day." Father made no response. On the sixth day of the hearing Mr. Fields was again not present. Father advised the court that he spoke with Mr. Fields and told him of the court date. The court allowed a recess so that Father could call Mr. Fields. The transcript does not reveal whether Father reached Mr. Fields or not; nevertheless, the hearing began once again without Father having an attorney to represent him. It was during this hearing that Father was afforded the opportunity to testify. Father testified but without the assistance of an attorney to question him. On the seventh and final day of trial, December 12, 2002, Father's attorney, Mr. Fields, was absent and again the trial proceeded without Father having an attorney. Father presented his own closing argument.

An examination of the major aspects of the trial reveals that Father did not have an attorney present during opening statements, cross examination of Mrs. Dobbs (the case manager and a key witness), testimony of the children, testimony of Mother, and closing statements. Additionally, Father did not have an attorney to present evidence during Father's case-in-chief or to conduct the direct examination of Father.[24]

The foregoing analysis of the performance, or lack thereof, of Father's attorney reveals that it was so inadequate it was equivalent to Father having no attorney. Father had the right to an attorney. It is also apparent that he needed an attorney. This is apparent from the fact the court appointed counsel to represent him at the inception of the case and the judge advised Father during the trial that he needed an attorney to represent him.[25] Based on the foregoing, we find that Father was without an attorney during numerous and critical phases of the trial.[26] Therefore, we find that Father's attempt to retain an attorney did not render the juvenile court's error, failing to appoint substitute counsel, harmless.

We further note that Father's first appointed counsel, who was appointed in January 1997, ceased participating and attending court proceedings ten months later, November 1997. The unexplained disappearance of Father's first appointed counsel corresponded with Father's incarceration for violating the terms of his bond. Father remained incarcerated awaiting trial and was subsequently sentenced to a six year term at 30%. Thus, he was incarcerated for approximately two

---

[24]Though it is not directly relevant to our holding, it is important that we note that Mr. Fields has been disbarred.

[25]Following the fifth day of trial the juvenile court judge stated "Now, your choices are to get Mr. Fields to be here to handle your case. I'm assuming that you're paying him to represent you. He needs to be here with you particularly for that day."

[26]This deprivation of rights is further compounded by the failure of Father's court appointed counsel to represent him while he was incarcerated for an extended period of time prior to trial.

years. No reason is given for the failure of Father's appointed attorney to attend court hearings while Father was incarcerated. Since there is no order indicating if and when Father's first attorney was granted leave to withdraw, we are unable to determine whether Father had an attorney during this period. What we can determine from the record before us is that Father did not have the benefit of an attorney during this period for no attorney made an appearance for Father for two and one-half years, from November 1997 until June 23, 2000, when Stephen Mills' name first appears. There is no order appointing Mr. Mills, his name simply appears on one of the reports where he is listed as counsel for Father. Though Father may or may not have been represented by an attorney during this period, there are significant gaps where no attorney appeared, or attended proceedings, or signed orders, reports or permanency plans for Father. The absence of counsel, which appears from the record - as inadequate as it is - leads us to conclude that, with the exception of a portion of the period during Mr. Mills' brief representation, Father was in essence without an attorney from November 1997 through the commencement of this appeal in 2003.[27]

The juvenile court committed error when it failed to appoint substitute counsel to represent Father. Father's unsuccessful attempt to retain counsel did not render this error harmless. Moreover, the failure of Father's court appointed counsel to attend court hearings on Father's behalf while Father was incarcerated serves to exacerbate this deprivation of the right to counsel. Accordingly, we find that Father was deprived of his constitutional right to counsel.[28]

We therefore vacate the judgment terminating Father's parental rights due to the deprivation of his right to an attorney and remand this issue to the juvenile court for further proceedings.

## In Conclusion

Accordingly, we vacate the order terminating Mother's parental rights and remand the issue to the juvenile court for further proceedings. Additionally, we vacate the judgment terminating Father's parental rights due to the deprivation of his right to an attorney and remand the issue to the juvenile court for further proceedings. Costs of appeal are assessed against the Tennessee Department of Children's Services.

_____
FRANK G. CLEMENT, JR., JUDGE

---

[27]The deprivation of the right to counsel continued until this matter was appealed and this court entered an order requiring the juvenile court to appoint counsel to represent Father on appeal.

[28]The foregoing determination renders as moot Father's remaining issue. Therefore, it will not be discussed.