IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
December 8, 2004 Session

## IN RE A.L.B., N.W.B. AND C.B.B.

**Appeal from the Circuit Court for Franklin County**
**No. J01647    Thomas C. Faris, Judge**

---

**No. M2004-01808-COA-R3-PT - Filed July 6, 2005**

---

This is a termination of parental rights case involving rights of both parents to their three young children. Parental rights of both parents were terminated after the trial court found substantial noncompliance with the permanency plan and persistence of conditions that led to the removal under Tennessee Code Annotated section 36-1-113 (g)(3), those conditions being filthy and unsanitary living conditions in the home. The court also found that termination was in the children's best interests. We reverse this decision and remand the case for further proceedings.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded

WILLIAM B. CAIN, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR. P.J., M.S. and PATRICIA J. COTTRELL, J., joined.

Glen A. Isbell, Winchester, Tennessee, for the appellants, N.W.B. and R.D.B.

Paul G. Summers, Attorney General and Reporter; Julie Pablo, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

Trudy McKelvey Edwards, Winchester, Tennessee, Guardian Ad Litem for A.L.B., N.W.B. and C.B.B.

### OPINION

#### I. Factual Background

The parents in the case are married and have given birth to three children: A.L.B. on 10/26/96, N.W.B. on 5/24/98, and C.B.B. on 4/5/00. Mother and Father are uneducated and extremely poor. The family first came to the attention of DCS in March of 2000 when a referral was made. The reason for the referral turned out to be without basis; however, at that time, the DCS

worker made a note of the poor living conditions in the home. It was noted that the children were dirty, the house had an odor of garbage, there were many caged animals in the house and animal feces was found on the floor. The refrigerator was extremely dirty, and food and garbage were lying all around the house. The house in which the family was living belonged to the paternal grandmother, and many of the animals living in the home were raised by her for resale. The house itself was extremely old and in need of numerous repairs. It had only one closet, no phone and no central air or heat; however, it did have working plumbing, running water, a bathroom, electricity, a refrigerator, and a useable kitchen. At that time, Mother was pregnant with the youngest child, C.B.B. DCS met with the parents to discuss their living conditions and made several home visits over the next few months. Some improvements were made in the living conditions during that time, and DCS did not pursue further action. The file on the family was closed thereafter.

A second referral was made in December 2001. The living conditions in the house were again found to be extremely bad. DCS made a referral for the family to receive in-home services beginning in December 2001 and closed their file again in January or February 2002 with the in-home services ongoing. The Southeast Community Services Agency provided these services; however, there was very little testimony as to what these services entailed. The Agency workers provided cleaning supplies and assistance with cleaning, but no other specifics were evidenced regarding the assistance provided in the home. The Agency also assisted the family in obtaining their own apartment. No Agency reports from this period were placed in evidence. The Agency workers mostly testified to some of the problems they witnessed at the Grandmother's house including the extreme poverty of the family, very little food in the house, dog feces on the floors, and general filth and clutter everywhere. After moving to the new apartment, the Agency workers also testified to the rapidly deteriorating condition of the apartment.

The family moved into a public housing apartment towards the end of April 2002. During the first few months after moving, Mother stated that she suffered from a back injury following her pregnancy. She was also attending class from 8:00 a.m. till 12:00p.m. in an attempt to obtain her GED, in addition to being primary care giver to the three small children. Father, who had previously been a shade tree mechanic at his mother's house, stated that he was unable to work or assist with many household duties due to a knee injury that required surgery. The family was living off of food stamps and other assistance. In July of 2002, the DCS case worker returned to check on the family and found the apartment to be a mess. The family was given another warning. The DCS worker again returned in August and still found numerous environmental problems including general filth and clutter, dirty children, and soiled diapers and trash lying around. The children were removed from the parents on August 30, 2002.

A parenting plan was put into place on September 18, 2002 with the goal of reunification. The parents' goals were to attend parenting classes, obtain jobs or otherwise establish a means of financial support for the family, maintain contact with the case manager, keep the house clean and free of clutter, have appropriate garbage disposal, wash dishes once a day, change beds sheets, keep harmful products out of reach of children, and maintain adequate and sanitary plumbing, water and toilet facilities.

In November of 2002, the family was evicted from the apartment as a result of Father's brother illegally tattooing in the apartment. An employee of the Housing Authority testified to the deplorable conditions in which the parents left the apartment after their eviction. Mother and Father then moved in with their preacher until they were able to rent a house in January 2003 on the same street where they had previously lived with the Grandmother. In April 2003, while living in the rental house, DCS attempted trial home visits with the hope of returning the children permanently to their parents.

The case workers did not testify to any problems with the environmental conditions during the family's time in the rental house. The home was found to be acceptable for a trial home placement for the children. One case worker and several foster parents did state that the children were dirty and smelled after visits with Mother and Father. However, the first extended home visits began in April 2003 and seemed to go well. The youngest child was placed back with the family full time and the oldest two children spent weekends with the family. The plan was that the two oldest children would also return home to live once school was out and that the return of all three children would be permanent. The family was receiving no services during this time and paid part of their rent by doing some repairs on the rental house. However, in May 2003, there was an allegation of child abuse due to spanking one of the children. As a result, Father was cited for child abuse, and the children were again removed in May 2003. Environmental conditions were not stated as a factor for this removal. The Petition to Terminate Parental Rights for all three children was filed on July 28, 3003.

Mother and Father were unable to continue living in the rental house and returned to the Grandmother's house shortly after the children were removed in May 2003. Since returning to the Grandmother's house, the family has attempted to clean the house and make some improvements including reinforcing weak floor areas, repairs to the bathroom, and adding plywood walls separating areas of the house where the children stay. However, the house remains extremely old, dirty and in need of extensive repairs.

The Termination of Parental Rights Hearing was set for November 19, 2003. At that time, DCS requested that the parents be given one final chance and recommended a 90 day trial home placement. This home placement began on November 19. Home services were again provided to the family beginning on December 3, and a new permanency plan was put in place on December 4, 2003. The primary requirement in the new permanency plan was that the parents maintain a safe and healthy living environment and that they diligently work with the home services agency to achieve that goal. A second goal of adoption was also added to the permanency plan. With regard to the parents' responsibilities, there are no specific requirements mentioned in this permanency plan.

The primary caseworker involved with this family, Dwayne Hill, testified that the parents weren't consistent in keeping the house clean; however, he did see that the family had made some improvement since he first became involved on August 30, 2002. During this last trial home

placement, he visited the house on several occasions and saw no reason to remove the children at anytime. His last home visit was on February 13, 2004.

The family also received in-home services from Family Connections during the children's last home placement. An extensive report outlining the conditions of the home, the support provided and improvements made by the family was placed into evidence in addition to the testimony of the case manager, Shelia Bayuk. Ms. Bayuk stated that she helped them with their housekeeping skills and with their job search. The parents completed a parenting class and made improvements in discipline. She did not see any major problems inside the home. Her observations were based on eight visits to the house from December 3, 2003 to February 19, 2004.

Another referral was made to child protective services on February 14, 2004 and an investigation was conducted on February 18, 2004. The investigator, Allison Pettijohn, believed the conditions to be unsuitable for the children and had the children removed again that same day. This was Ms. Pettijohn's only contact with the family. She based her removal on the single visit to the home on February 18, 2004.

In February 2004, Husband began working for a lumber company and, for the first time, began earning an income from full time employment. The parents have also continued to make some improvements to the house and have made an effort to clean up the yard.

The Termination of Parental Rights Hearing was held over several days on May 9 and June 4 and 16, 2004. The trial court heard testimony from numerous DCS workers involved since March of 2000, several foster parents, the children's teachers, both parents, in-home services workers, the local Chief of Police, a representative of Child Protective Services and a representative of the Housing Authority. The court also viewed numerous exhibits, including pictures taken at various times beginning with DCS's first involvement until the time of trial and the two permanency plans for each child. The trial judge also made an impromptu visit to the Grandmother's home on June 16, 2004.

The trial judge, in his Findings of Fact, recounted in some detail the testimony of all the witnesses and stated which witnesses he found to be credible and not credible. However, this Findings of Fact, Conclusions of Law, Order Terminating Parental Rights, and Final Decree never state exactly which facts he determined to be true and leaves some doubt as to what facts the trial court actually relied on in making its decision. Ultimately, the trial court decided to terminate the parental rights of both parents finding:

## CONCLUSIONS OF LAW

1. The Court concludes that the Department of Children's Services has made reasonable efforts under T.C.A. Section 37-1-166 to provide to the family of the children, consistent with the time period in the Department Permanency Plan, such

services as the Department deems necessary for the safe return of the children to their home.

2. That pursuant to T.C.A. Section 36-1-113(c) "Termination of Parental or Guardianship rights must be based upon (1) a finding by the Court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) that termination of the parents' or guardians' rights is in the best of interests of the child." (Emphasis added).

3. That the State has proven by clear and convincing [evidence] that pursuant to T.C.A. Section 36-1-113(g)(3), the children have been removed from the home of their parents for a period of six (6) months and the conditions which led to the children's removal would subject the children to further neglect and which would prevent the children's safe return to their parents, still persist. Further, the conditions will not be remedied or changed in the near future and the continuation of the parent/child relationship greatly diminishes the children's chances of early integration into a safe, stable, and permanent home.

4. That the State has proved by clear and convincing evidence that the parents have failed to act in the best interests of the children by failing to make any meaningful and consistent effort to address the environmental condition of their place of residence and therefore, it would be in the best interests of the children for the parental rights of [parents] to be terminated as to the minor children who are the subject of this cause. The Court finds substantial non-compliance with the permanency plan and a persistence of conditions of long standing.

The parents appeal the trial court's ruling and state the issues as follows:

1. WHETHER THE TRIAL COURT ERRED IN IT'S RULING WHEN IT RULED THAT THERE WAS SUBSTANTIAL NON-COMPLIANCE OF THE PERMANENCY PLANS BY CLEAR AND CONVINCING EVIDENCE AS GROUNDS FOR TERMINATION OF THE APPELLANT'S PARENTAL RIGHTS.

2. WHETHER THE TRIAL COURT ERRED IN IT'S RULING WHEN IT RULED THAT THERE WAS PERSISTANCE OF CONDITIONS BY CLEAR AND CONVINCING EVIDENCE AS GROUNDS FOR TERMINATION OF THE APPELLANT'S PARENTAL RIGHTS.

3. WHETHER THE TRIAL COURT ERRED IN RULING THAT THE APPELLANTS DID NOT PROVE BY CLEAR AND CONVINCING EVIDENCE THAT IT WAS IN THE BEST INTEREST OF THE CHILDREN TO TERMINATE THE APPELLEE'S RIGHTS.

## II. Burden of Proof

The State has the burden of proving by clear and convincing evidence that the grounds for terminating the parental rights of both parents exists and that termination would be in the best interest of the children. Tenn.Code Ann. 36-1-113(c)(1-2).

> In order to terminate a parent's parental rights to their minor children, the state must prove the existence of one of the statutory grounds for termination by clear and convincing evidence and that termination is in the childrens' best interest. *Santosky*, 455 U.S. at 769-70; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn.2002); *In re Drinnon*, 776 S.W.2d at 97; Tenn.Code Ann. § 36-1-113(c) (2003). A finding that the state has proven the existence of any one of the statutory grounds for termination found in section 36-1-113(g) of the Tennessee Code is enough to support the trial court's decision to terminate a parent's parental rights. *In re Valentine*, 79 S.W.3d at 546; *see also In re C.W.W.*, 37 S.W.3d 467, 475 (Tenn.Ct.App.2000).

*State v. Baruchman*, No. W 2004-02071-COA-R3-PT, 2005 WL 729183, at *4 (Tenn.Ct.App. March 29, 2005).

The heightened standard of proof required for termination, clear and convincing evidence, stems from the judicially recognized fundamental right of a biological parent to the care, custody and control of his or her children.

> "A biological parent's interest in the care, custody, and control of his or her child is among the oldest of the judicially recognized fundamental liberty interests." *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn.Ct.App.2001) (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). Both the United States and Tennessee Constitutions recognize that parents have a fundamental right to the care, custody, and control of their children. *Santosky v. Kramer*, 455 U.S. 745, 754 (1982); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Keisling v. Keisling*, 92 S.W.3d 372, 378 (Tenn.2002); *In re Swanson*, 2 S.W.3d 180, 187 (Tenn.1999); *Hawk v. Hawk*, 855 S.W.2d 573, 579 (Tenn.1993); *Ray*, 83 S.W.3d at 732. However, this is not a right which is entirely immune from state involvement. *In re Drinnon v. Brown*, 776 S.W.2d 96, 97 (Tenn.Ct.App.1988). A biological parent's rights regarding the custody of minor children will continue so long as the parents have not voluntarily relinquished their rights, abandoned their rights, or engaged in conduct requiring the limitation or termination of their rights. *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn.2002); *Stokes v. Arnold*, 27 S.W.3d 516, 520 (Tenn.Ct.App.2000).

*State v. Puryear*, No. W2004-02878-COA-R3-PT, 2005 WL 735038, at *3 (Tenn.Ct.App. Feb. 15, 2005). This heightened standard also reflects the serious and permanent nature of terminating these fundamental rights.

A parent has a fundamental right to the care, custody and control of his or her child. *Stanley v. Illinois*, 405 U.S.645, 651, 92 S.Ct. 1208, 1212-13 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn.1996); *In Re Adoption of a Female Child*, 896 S.W.2d 546, 547 (Tenn.1995); *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn.1994). This right is a fundamental but not absolute right, and the state may interfere with parental rights if there is a compelling state interest. *Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 1391 (1982); *Nash-Putnam*, 921 S.W.2d at 174-75.

Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger, "severing forever all legal rights and obligations of the parent." Tenn.Code Ann. § 36-1-113(*l*)(1). The United States Supreme Court has recognized the unique nature of proceedings to terminate parental rights, stating that "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 565 (1996) (quoting *Santosky*, 455 U.S. at 787, 102 S.Ct. at 1412 (Rehnquist, J., dissenting)). As a result, "[t]he interest of parents in their relationship with their children is sufficiently fundamental to come within the finite class of liberty interests protected by the Fourteenth Amendment." *Id.* The constitutional protections of the parent-child relationship require certain safeguards before the relationship can be severed. *O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn.Ct.App.1995). This most drastic interference with a parent's rights requires "the opportunity for an individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn.1999).

Our legislature has established those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought, Tenn.Code Ann. § 36-1-113(g), and parental rights may be terminated only in those statutorily defined circumstances. *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn.Ct.App.1998). Because the decision to terminate parental rights affects fundamental constitutional rights, courts must apply a higher standard of proof when adjudicating the termination cases. *Santosky*, 455 U.S. at 769, 102 S.Ct. At 1403; *In re M.W.A.*, 980 S.W.2d at 622; *O'Daniel*, 905 S.W.2d at 186. To justify the termination of parental rights, the grounds for termination must be established by clear and convincing evidence. Tenn.Code. Ann. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn.2002). "This heightened standard . . . serves to prevent the unwarranted termination or interference with the biological parents' rights to their children." *In re M.W.A.*, 980 S.W.2d at 622.

The existence of any one statutory ground will support termination of an individual's parental rights. *In re C.W.W.*, 37 S.W.3d at 473. In addition, if a court,

applying the appropriate evidentiary standard, determines that one of the grounds exists, the court must also find, using the clear and convincing evidence standard, that termination is in the child's best interest. Tenn.Code Ann. § 36-1-113(c)(2). However, a best interests analysis is not warranted unless grounds have been proved.

*In re D.D.K.*, No. M2003-01016-COA-R3-PT, 2003 WL 23093929 (Tenn.Ct.App.).

The clear and convincing evidence standard is a heightened burden of proof and has been explained by this Court.

> No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever. Tenn.Code Ann. § 36-1-113(i)(1); *M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 565 (1996); *In re Knott*, 138 Tenn. 349, 355, 197 S.W. 1097, 1098 (1917); *In re D.D.K.*, No. M2003-01016-COA-R3-PT, 2003 WL 23093929, at *8 (Tenn.Ct.App. Dec. 30, 2003) (No Tenn.R.App. P. 11 application filed). Because the stakes are so profoundly high, Tenn.Code Ann. § 36-1-113(c)(1) requires person seeking to terminate a biological parent's parental rights to prove the statutory grounds for termination by clear and convincing evidence. This heightened burden of proof minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d at 622. Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn.Ct.App. Aug. 13, 2003) (No Tenn. R.App. P. 11 application filed), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn.2002); *In re S.M.*, 149 S.W.3d at 639; *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn.Ct.App.2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn.Ct.App.2002); *Ray v. Ray*, 83 S.W.3d at 733; *In re C.W.W.*, 37 S.W.3d at 474.

*In re F.R.R., III*, No. M2004-02208-COA-R3-PT, 2005 WL 473470, at *2 (Tenn.Ct.App. March 1, 2005).

> The "clear and convincing evidence" standard defies precise definition. *Majors v. Smith*, 776 S.W.2d 538, 540 (Tenn.Ct.App.1989). While it is more exacting than the preponderance of the evidence standard, *Santosky v. Kramer*, 455 U.S. at 766, 102 S.Ct. At 1401; *Rentenbach Eng'g Co. v. General Realty Ltd.*, 707 S.W.2d 524, 527 (Tenn.Ct.App.1985), it does not require such certainty as the beyond a reasonable doubt standard. *Brandon v. Wright*, 838 S.W.2d 532, 536 (Tenn.Ct.App.1992); *State v. Groves*, 735 S.W.2d 843, 846 (Tenn.Crim.App.1987).

Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence. *See Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn.1992). It should produce in the fact-finder's mind a firm belief or conviction with regard to the truth of the allegations sought to be established. *In re Estate of Armstrong*, 859 S.W.2d 323, 328 (Tenn.Ct.App.1993); *Brandon v. Wright*, 838 S.W.2d at 536; *Wiltcher v. Bradley*, 708 S.W.2d 407, 411 (Tenn.Ct.App.1985).

*O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn.Ct.App.1995).

There are two statutory grounds at issue in this case, either one of which must be proven by clear and convincing evidence:

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4;

(3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parents(s) or guardian(s) in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn.Code Ann. 36-1-113(g)(2-3) (Supp.2004).

### III.  Substantial Noncompliance

With regard to the issue of substantial noncompliance with the permanency plan, we cannot find clear and convincing evidence to support this ground for terminating the parents' parental rights. The last permanency plans put in place for these children were dated December 4, 2003. These plans contain virtually no specific requirements for the parents other than visiting with the children while they are in foster care and providing their own transportation to and from the visitation site. Under the goal of reunification, the desired outcome is stated as, "Children will remain at home with

parents in a physically safe, adequate, healthy (sanitary) living environment," and under action needed to achieve desired outcome, the plan states, "DCS worker will make referral to FSS for in-home services to work on keeping house clean and safe. DCS worker will make unannounced home visits and document results. The parents will work diligently with in-home services to keep their house clean and safe."

> Tenn.Code Ann. § 36-1-113(g)(2) provides that termination of parental rights may be based upon "substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan." In order to base termination upon this ground, the trial court must find, as an initial matter, that the responsibilities enumerated in the permanency plan "are reasonable and are related to remedying the conditions which necessitate foster care placement." Tenn.Code Ann. § 37-2-403(a)(2)(C)(2001). The trial court must then determine whether the noncompliance is substantial. In making this determination, the lower court must measure "the real worth and importance of noncompliance . . . by both the degree of noncompliance and the weight assigned to that requirement." *Id.* at 548.

*State v. Taylor*, M2003-01680-COA-R3-PT, 2004 WL 941098, at *2 (Tenn.Ct.App. April 29, 2004).

In this case, the trial judge made no finding of what the requirements of the Permanency Plan were nor whether they are reasonably related. As such, this issue is reviewed without any presumption of correctness. *In re Valentine*, 79 S.W.3d 539, 547 (Tenn.2002)*; In re: Z.J.S. and M.J.P.*, M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn.Ct.App. June 3, 2003).

The only testimony in the record with regard to the home environment from November 19, 2003, when the 90-day trial home placement was begun, until February 18, 2004, when the children were removed for the final time, is that of Mother, Father, the children's teachers, Dwayne Hill (the family's primary case manager), Alison Pettyjohn (of Child Protective Services), and Sheila Bayuk (the family's in-home services worker assisting them during this time). The trial judge found the testimony of Mother, Father and Ms. Bayuk to lack credibility. With regard to Ms. Bayuk, the court stated, "With all due respect (sic) to Ms. Bayuk, who the court felt was sincere, the court respectfully does not find her testimony credible. Her testimony is at variance and at odds with virtually every other worker or professional who went to the home and apparently she simply took the respondents' words for the efforts they were making." However, the majority of the other testimony referred to is from time periods months, even years, earlier. Ms. Bayuk's testimony evidences close interaction with the family and is corroborated by her detailed reports made contemporaneously to her contacts with the family and not contradicted by the testimony of Dwayne Hill.

According to Mr. Hill, sometimes the condition of the home was better than others, but he never saw enough of a problem to remove the children after the 90-day placement began. He further stated that one of the big issues was the dogs in the home. However, in neither the December 2003 Permanency Plan nor the earlier September 18, 2002, Permanency Plan was the issue of dogs discussed. Mr. Hill also testified that some effort had been made to clean up the home and that at

his last visit on February 13, 2004, the home was decent and there was no need to remove the children. He further stated that the children were not filthy during this trial placement period and things appeared to be going well until the end.

Ms. Bayuk testified that she saw improvements in the parents' housekeeping and that the parents participated with her when she was in the home to assist and demonstrated better discipline and parenting skills. She found the parents to be good parents and did not see major problems inside the home. She did not find the children to be particularly dirty nor did she observe them to be hungry. She also found numerous good aspects to the family in that there were no drug or alcohol problems, the parents attended to the medical needs of the children, the children had good self esteem and interaction with others, the family had transportation, the parents had just one marriage partner, and all the children were of that marriage.

N.W.B.'s teacher testified to the 90-day trial placement (November 19, 2003 through February 18, 2004) time period during which time she taught him in school. She stated that when he showed trouble paying attention, the parents came in promptly to discuss his problems with her. She felt that the children were acceptably dressed during this period, and the only issues were some disciplinary problems. N.W.B. regularly had his homework done, and proper supplies for school were provided. Occasionally, his clothes were stained but were not dirty. She felt that his behavioral problems were due to being transferred from another school and being in foster care. A.L.B.'s teacher also testified and stated that she struggled a bit in school but her behavior was fairly normal. She noticed that the child's clothes were often too big and her hair was occasionally not combed. She also occasionally had an odor. However, she had appropriate school supplies and did her homework. Further, Mother came to the school when requested and showed appropriate concern when the teacher wished to discuss possible learning problems with her.

The only person who testified to the need for the children's removal during this period was Alison Pettyjohn of Child Protective Services. She stated that, on the day of her inspection, there was dog poop on the floor, the children were dirty and the house was extremely cluttered. Ms. Pettyjohn took pictures of the home on the day the children were removed, February 18, 2004, which were placed into the record. She testified that the conditions in the picture depicted the reasons for the children's removal. However, although the house is still in poor condition and extremely messy, the pictures actually demonstrate some improvement since these children first came to DCS's attention.

The parents testified that, since the children's final removal, they have continued to make improvements in the home, and the evidence corroborates this testimony. Pictures taken by the guardian ad litem the day before trial demonstrate some additional improvements to the home and show it to be in a liveable condition. Father had also begun working a full-time job and is in a financially better position to make appropriate repairs to the home, obtain a separate home for the family, and otherwise provide for the children. Based on the evidence presented from the beginning of the last 90-day trial home placement through the final date of the trial, we cannot find clear and

convincing evidence that the parents failed to substantially comply with the statement of responsibilities as set out in the December 4, 2003, Permanency Plan.

## IV. Persistent Conditions

The primary ground for termination at issue in this case is persistence of conditions as defined by Tennessee Code Annotated section 36-1-113(g)(3)(A). In this case, the children have been in DCS custody since August 30, 2002. However, determining whether "the conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist," that "there is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future," and that "the continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home," is a much more difficult job for this Court. Each of these three factors must be proven by clear and convincing evidence. *Valentine*, 79 S.W.3d at 149-50.

The majority of the testimony in this case comes from persons involved with this family beginning with the initial referral in March of 2000 until the children were removed in August of 2002. There is little doubt that extremely unsanitary environmental conditions existed which caused these children to be removed from the home. However, there is much less testimony with regard to the environmental conditions beginning with the first trial home placement in Spring of 2003. As mentioned earlier, there is virtually no testimony of environmental concerns while the family was renting a home beginning in January of 2003. During this time, the trial home visits seemed to go well, and the children were removed from the home as a result of an abuse allegation, not environmental concerns. After this removal, there is, again, virtually no testimony with regard to the condition of the home until November of 2003, when DCS recommended a 90-day home trial placement. It seems evident from this recommendation and Mr. Hill's notes and testimony, that the conditions of the home had improved to the point where DCS, and in particular the case manager, felt that reunification was possible. Further, the testimony of Dwayne Hill and Sheila Bayuk leads this Court to the conclusion that the parents had much improved their living conditions since the children were removed in 2002. These two individuals found the condition of the home to be such that the children were in no danger or need of removal.

The testimony of the children's teachers also corroborate that the children were cared for by their parents and not sent to school filthy. The only witness who testified that the environment conditions were so poor that the children needed to be removed was Alison Pettyjohn of Child Protective Services. However, as stated previously, Ms. Pettyjohn's opinion is based on one visit to the family, and the pictures taken by Ms. Pettyjohn at the time of the children's removal actually seem to demonstrate some improvement in the living conditions since the children were first removed and placed in DCS custody.

In February of 2004, Dwayne Hill ceased being the family's case manager and their case was handed over to Gwen Owens. Since the children's removal in February 2004, she has made two home visits and found the home to still be messy and extremely cluttered with a foul smell still prevalent. On one visit the home was acceptable; on the other the conditions were found to be unacceptable with the house filthy and cluttered and dog poop on the floor.

As the trial judge himself found, this is an extremely difficult case. After his visit to the home during the hearing, he made the following findings in open court:

These remarks are just my findings of fact. They do not indicate how I'm going to rule on this matter because, frankly, if I had a definite ruling in mind right now I would announce it.

The following is germane: Found the front porch or the front porch floor to be weak. There was a parrot in the living room, and I'm not claiming I observed everything. There was a small dog, a Chihuahua, that was identified by the gentleman there as being [Mother's], who was present. Saw one cat in the front side room. There was an odor in the room. Then I saw birds and another cat. Then I saw two beds, which I would have taken to have been that of the two boys. Still an odor in that room.

The kitchen was somewhat unkempt, but I did not find it to be filthy. There were cats. There was an odor in that room. The utility room floor I thought was weak. I went in Amber's room, did not find the hole that everybody talked about but I didn't look that hard for it. The bathroom appeared to have had some repairs or some sort of new floor covering that had been applied to the floor.

The entrance to the upstairs appeared to have had some work done on it in the form of new particle board. There were two doors upstairs that were padlocked. The gentleman opened one of them. The other room he was unable to open and stated it was a storage room.

I found the upstairs bedroom, that of the mother and father, to be a total mess. I mean, it just was. There were things strewn everywhere, and it was very unkempt. Went back downstairs to what has been identified as [the Grandmother's] room, again found it to be a mess. There were lots of old clothes and junk around. There were some spider webs, and there was some dried feces in a – – in a bowl. The three dogs at the house were a little Chihuahua, her puppy and a little fiest that were actually in the house.

The outside of the house, folks, I did not find to be all that bad. I have seen farm houses that had worse outsides, and I did not place much in the way of either positive or negative there.

I've mentioned it about three times, so let me just say what's on my mind. There is a considerable odor or smell to the property that is discernible, easily identifiable within house. I found that to be somewhat disturbing. With that said, those are essentially the findings of fact I make from the visit to the house.

. . . . Folks, it is hard to terminate a situation based essentially purely on filth or health hazard unless the proof is clear and convincing evidence.

However, the judge went on to state in his Findings of Fact that his visit and his findings from the home visit had no effect on his decision.

We are dealing with an unbelievably poor family with two generations of unsanitary and messy living habits. However, in looking at all the evidence presented, we cannot say that there was clear and convincing evidence of persistent conditions that prevent the children's safe return to their family and that there is little likelihood that these conditions will be remedied at an early date. Although improvements have come to this family gradually, the record reflects that improvements have come. These improvements are most clearly shown by Father's obtaining a full-time job, the efforts made to clean up the yard, and repairs made to the inside of the home.

As pointed out by several witnesses, these parents love their children. The record demonstrates repeatedly that the children love their parents and want to be home with them. There is no evidence of drug or alcohol problems in the home. The children are healthy, and the parents obtain appropriate medical care for their children when necessary. There have been no injuries as a result of the environmental conditions in the home nor have any medical records or testimony been placed into evidence showing that these environmental conditions have caused harm to the children.

We also cannot say that the evidence is clear and convincing that "continuation of the parent or guardian [and child] relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home." Although one case worker testified that the children were "adoptable," there was no testimony that any family yet wished to adopt these children. Further, in looking at the improvements made by the family and the overwhelming desire of the children to return home to the parents, it appears that there is still a good chance that the children can return permanently to their parents if improvements by the parents continue.

Another issue to be considered is that of the reasonable efforts made by DCS in this case.

Unless permitting a child to remain with the biological parent will expose the child to a substantial risk of harm, DCS must make "reasonable efforts" to "[p]revent the need for removal of the child" or, if the child has already been removed, to "[m]ake it possible for the child to return home." Tenn.Code Ann. § 37-1-166(a) (2003); *see also In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 Tenn.App. LEXIS 160, at *22-23 (Tenn.Ct.App. Mar. 9, 2004). The burden of proving that reasonable efforts have been made in a particular case falls upon DCS. Tenn.Code

-14-

Ann. § 37-1-166(b) (2003). In meeting this burden, DCS is required, as it did in this case, to file with the juvenile court an affidavit setting forth the "reasonable efforts" made by DCS. Tenn.Code Ann. § 37-1-166(c) (2003).

Whether DCS has used reasonable efforts in a particular case is a fact specific inquiry, and we examine such efforts on a case-by-case basis. The legislature has defined "reasonable efforts" as "the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tenn.Code Ann. § 37-1-166(g)(1) (2003). While DCS bears the burden of proving that reasonable efforts toward reunification are made in a particular case, we are cognizant of the fact that "[r]eunification of a family is a two-way street, and the law does not require DCS to carry the entire burden of this goal." *State v. Belder*, No. W2003-02888-COA-R3-PT, 2004 Tenn.App. LEXIS 441, at *24 (Tenn.Ct.App. July 9, 2004); *State v. Malone*, No. 03A01-9706-JV-00224, 1998 Tenn.App.LEXIS 83, at *5-6 (Tenn.Ct.App. Feb. 5, 1998). The efforts employed by DCS in a particular case do not have to be "Herculean," *In re C.M.M.*, 2004 Tenn.App. LEXIS 160, at *25, but they must be "reasonable efforts." Tenn.Code Ann. § 37-1-166(a)(1) (2003); *Malone*, 1998 Tenn.App. LEXIS 441, at *6.

*State v. Puryear*, 2005 WL 735038, at *9.

Although in-home services of some kind were offered to this family, there is little evidence in the record, especially during the initial in-home service period in 2002, of exactly what services were provided. We know some assistance was given to the family in obtaining cleaning supplies and in cleaning the home and some type of parenting class was provided to the parents, but no specific information is in the record regarding these services. There is also no evidence that any type of mental or emotional testing was done to determine their level of functioning, whether psychological issues or depression might be a factor, nor whether any counseling might be required. Further, it appears that the only periods that any services were offered were prior to the children's removal in 2002 and during the 90-day home trial placement period from December 2003 through February 2004. It appears that the family went from September of 2002 until December of 2003 without any type of assistance from DCS. During this time, the children apparently languished in foster care without much effort on the part of DCS to assist with reunification.

## V. Best Interests of the Children

With regard to the best interest of the children, we do not reach this issue, as the State failed to prove, through clear and convincing evidence, any statutory ground for terminating the parental rights of these parents.

## VI. Conclusion

In preparing this opinion, the Court has read through many termination cases, and we are struck by the absence of any other factors besides the poverty of the family and poor living conditions in the home. In most cases we also see prevalent physical or sexual abuse, drug and alcohol abuse, severe neglect and unconcern for the children's welfare, lack of medical care, lack of supervision, extreme physical and emotional delays in development of the children, mental illness of the parent, prostitution, severe mental incapacity of parent, criminal activity, incarceration, or other equally egregious factor. This case only deals with extremely dirty living conditions and extreme poverty, with no evidence of actual harm to the children.

The observations of this Court in *In re Drinnon*, 776 S.W.2d 96 (Tenn.Ct.App.1998) apply with equal force to both husband and wife – – father and mother – – in this case.

> The Chancellor based his final decision on the relative merits of the parents, stating that the mother cannot supply the extraordinary needs of the children. The Chancellor concedes it is not a willful failing on her part; it is simply a matter of mental ability. He finds the children need a stable environment with a lot of encouragement and discipline.

> The mother argues that the evidence is not clear and convincing that she would not be able to adequately provide for the psychological maturation and physical safety of the children. While she will need the assistance of a homemaker and special education classes for the children, she argues that she will be able to care for her children.

> That the foster parents' have a home, which can offer more in terms of material things, and quality of life is undisputed. That they are also intelligent and can aid the children in school is evident. But those advantages are not the question, nor is custody the question. The issue is much more permanent: It's whether you sever the blood relationship –- the symbolic umbilical cord between mother and child. It's whether Loretta Drinnon will ever suffer the pain and pleasure of being a mother again to these children.

> Judges may exercise the power of the state to cut the parental bond and terminate parental rights only if there is clear and convincing evidence . . . the conditions which led to the removal still persist and will not be cured at an early date.

*In re Drinnon*, 776 S.W.2d at 100.

The judgment of the trial court terminating the parental rights of these parents is not supported by clear and convincing evidence and must be reversed with the case remanded to the trial court for further proceedings. Whether or not reunification of this family can be accomplished must await further proceedings in the trial court.

-16-

Costs of appeal are assessed against the State of Tennessee, Department of Children's Services.


_____
WILLIAM B. CAIN, JUDGE